UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-640 |
| | ) | |
| ALTIVIA PETROCHEMICALS, LLC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency (EPA), files this complaint and alleges as follows:

## NATURE OF ACTION

1.      This is a civil action brought against ALTIVIA Petrochemicals, LLC ("ALTIVIA" or "Defendant") pursuant to Clean Air Act (CAA) Section 113(b), as amended, 42 U.S.C. § 7413(b), to obtain injunctive relief and civil penalties for violations of CAA Section 112, 42 U.S.C. § 7412, and the implementing regulations at: (1) 40 C.F.R. Part 63, Subpart F (National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry); (2) 40 C.F.R. Part 63, Subpart G (National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and

Wastewater); (3) 40 C.F.R. Part 63, Subpart H (National Emission Standards for Organic

Hazardous Air Pollutants for Equipment Leaks); (4) EPA Reference Method 21 at 40 C.F.R.

Part 60, Appendix A; and (5) 40 C.F.R. Part 70, Title V Permit Program. The violations alleged

in the complaint occurred and continue to occur at Defendant's petrochemical manufacturing

facility in Haverhill, Scioto County, Ohio ("Haverhill Facility").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1345, and 1355 and under CAA Section 113(b), 42 U.S.C. § 7413(b).

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395 and under

CAA Section 113(b), 42 U.S.C. § 7413(b), because Defendant resides within this District and

because the violations that constitute the basis of this complaint occurred and are occurring at

Defendant's facility located in the District.

## NOTICE

4.      The United States provided notice of the commencement of this action to the

State of Ohio as required by CAA Section 113(b), 42 U.S.C. § 7413(b).

## AUTHORITY

5.      The United States has authority to bring this action on behalf of the Administrator

of EPA under 28 U.S.C. §§ 516 and 519 and CAA Section 305, 42 U.S.C. § 7605.

## DEFENDANT

6.      ALTIVIA is a limited liability company incorporated in Delaware and

headquartered in Houston, Texas. ALTIVIA owns and operates the Haverhill Facility, a

petrochemical manufacturing facility located at 1019 Haverhill-Ohio Furnace Road, Haverhill, Ohio.

7.     ALTIVIA acquired the Haverhill Facility in 2015 from Haverhill Chemicals LLC through an asset purchase agreement approved by the United States Bankruptcy Court for the Southern District of Texas, as part of Haverhill Chemicals' Chapter 11 bankruptcy proceedings. The asset purchase agreement requires ALTIVIA to assume all liability under assigned permits, including the then existing Title V permit for the Haverhill Facility.

8.     On November 22, 2015, ALTIVIA restarted operations at the Haverhill Facility, which had been shut down since June 2015.

9.     ALTIVIA is a "person," as defined in CAA Section 302(e), 42 U.S.C. § 7602(e).

## CLEAN AIR ACT

### I.   STATUTORY AND REGULATORY BACKGROUND

10.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population. 42 U.S.C. § 7401(b)(1).

#### A.   National Emission Standards for Hazardous Air Pollutants

##### 1.   General Provisions

11.     Under CAA Section 112(b), 42 U.S.C. § 7412(b), Congress established a list of hazardous air pollutants (HAPs) believed to cause adverse health or environmental effects.

12.     Under CAA Section 112(c), 42 U.S.C. § 7412(c), Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.

13.     "Major source" is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to

3

emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1).

14.     "Stationary source" is defined as any building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7412(a)(3) (incorporating the definition of "stationary source" found at 42 U.S.C. § 7411(a)(3)).

15.     Under CAA Section 112(d)(1), 42 U.S.C. § 7412(d)(1), Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs listed under Section 112(c). These emission standards must require the maximum degree of reduction in emissions of hazardous air pollutants that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies. *See* 42 U.S.C. § 7412(d)(2).

16.     Under CAA Section 112(h), 42 U.S.C. § 7412(h), to the extent that it is not feasible to prescribe or enforce an emission standard for control of a HAP, Congress authorized EPA to promulgate "design equipment, work practice, or operational" standards, which are to be treated as emission standards.

17.     These emission standards are known as the National Emission Standards for Hazardous Air Pollutants (NESHAPs) for Source Categories or maximum achievable control technology (MACT) standards.

**2.  National Emission Standards for Organic Hazardous Air Pollutants**

18.     Pursuant to CAA Section 112(c), 42 U.S.C. § 7412(c), EPA identified synthetic organic chemical manufacturing as a source category of HAPs. 57 Fed. Reg. 31576, 31591

4

(Table 1) (July 16, 1992). The Synthetic Organic Chemical Manufacturing Industry source category generally is referred to as SOCMI.

19.     Pursuant to CAA Section 112(d), 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry. 59 Fed. Reg. 19402 (April 22, 1994). These standards are commonly referred to as the "Hazardous Organic NESHAP" or the HON.

20.     The HON consists of four subparts in Part 63 of Title 40 of the Code of Federal Regulations: Subparts F, G, H, and I.

21.     Subpart F, in general, provides the applicability criteria for SOCMI sources, requires that owners and operators of SOCMI sources comply with Subparts G, H, and I, and specifies general recordkeeping and reporting requirements. Subpart G generally sets forth regulations governing process vents, storage vessels, transfer racks, and wastewater streams at SOCMI sources. Subparts H and I generally set forth work practice standards relating to equipment leaks.

### a. *HON Subpart F*

22.     The requirements of Subpart F apply to chemical manufacturing process units that, *inter alia*: (1) manufacture as a primary product one or more chemicals listed in Table 1 of Subpart F; (2) use as a reactant or manufacture as a product, or co-product, one or more of the organic HAPs listed in Table 2 of Subpart F; and (3) are located at a plant site that is a major source as defined in CAA Section 112(a). 40 C.F.R. § 63.100(b).

23.     A "chemical manufacturing process unit" is defined, *inter alia*, as the equipment assembled and connected by pipes or ducts to process raw materials and to manufacture an intended product. 40 C.F.R. § 63.101(b).

24.     Table 1 of Subpart F lists approximately 385 chemicals which constitute SOCMI products that may be produced by a HAP-emitting process. 40 C.F.R. Subpart F, Table 1; 59 Fed. Reg. 19402, 19405 (1994). Each chemical in Table 1 has a specific "Group Number" associated with it, ranging from Group I to Group V. The Group Number in Table 1 corresponds to the timing of the applicability of certain provisions of the HON.

25.     Table 2 of Subpart F lists approximately 130 organic HAPs. 40 C.F.R. Subpart F, Table 2.

26.     Owners and operators of sources that are subject to Subpart F are required to comply with Subparts G and H. 40 C.F.R. § 63.102(a).

**b. *HON Subpart G: Process Vents***

27.     Subpart G applies, *inter alia*, to all process vents within a source that is itself subject to Subpart F. 40 C.F.R. § 63.110.

28.     With certain exceptions not applicable here, owners and operators of existing sources were required to be in compliance with the applicable provisions of Subpart G by no later than April 22, 1997. 40 C.F.R. § 63.100(k)(2)(i).

**c. *HON Subparts H and I: Equipment Leaks***

29.     Subpart H sets forth work practice standards and testing and recordkeeping requirements to ensure that any leaks of organic HAPs from equipment are timely detected and repaired. The provisions in Subpart H are commonly referred to as "Leak Detection and Repair" (LDAR) provisions. The provisions of Subpart I specify certain additional processes subject to Subpart H.

30.     The "equipment" to which Subpart H applies includes pumps, compressors, agitators, pressure relief devices, sampling connection systems, open-ended valves or lines,

valves, connectors, surge control vessels, bottom receivers, instrumentation systems, and control devices or closed-vent systems required by Subpart H that are intended to operate in organic HAP service 300 hours or more during the calendar year, within a source subject to the provisions of a specific Subpart in 40 C.F.R. Part 63 that references Subpart H. 40 C.F.R. § 63.160.

31.     "In organic HAP service" means that a piece of equipment either contains or contacts a fluid (liquid or gas) that is at least 5% by weight of total organic HAPs. 40 C.F.R. § 63.161.

32.     With certain exceptions not applicable here, existing sources were required to be in compliance with applicable provisions in Subpart H by no later than October 23, 1995, depending upon the "Group" status of the chemicals being manufactured. 40 C.F.R. § 63.100(k)(3)(i).

### 3.   Violations of the NESHAPs

33.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to CAA Section 112, no person may operate such source in violation of such standard, limitation, or regulation. 42 U.S.C. § 7412(i)(3).

### B.   Title V Permit Program

34.     CAA Title V, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain major sources of air emissions. Pursuant to CAA Section 502(b), 42 U.S.C. § 7661a(b), on July 21, 1992, EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a permit program to be administered by any state or local air pollution control agency. *See* 57 Fed. Reg. 32250 (July 21, 1992). These regulations, codified at 40 C.F.R. Part 70, are referred to herein as the "Title V regulations."

35.     The Title V regulations define "major source" at CAA Section 501, 42 U.S.C. § 7661(2), and 40 C.F.R. § 70.2, as, among other things, any stationary source which directly emits or has the potential to emit 100 tons or more per year of any regulated air pollutant.

36.     Under Title V, CAA Section 502(a), 42 U.S.C. § 7661a(a), it is unlawful for any person to violate any requirement of a permit issued under Title V or to operate a "major source" except in compliance with a permit issued by a permitting authority under Title V.

37.     Title V, CAA Section 504(a), 42 U.S.C. § 7661c(a), and 40 C.F.R. § 70.6(a), require that each Title V permit include, among other things, enforceable emission limitations and such other conditions as are necessary to assure compliance with "applicable requirements" of the Act and the requirements of the relevant State Implementation Plan (SIP).

38.     The Title V regulations define "applicable requirement" as including any relevant NESHAP requirements. *See* 40 C.F.R. § 70.2.

39.     All the state and regional air authorities at issue in this matter have fully approved Title V programs that are in accordance with the Federal Title V regulations. On August 15, 1995, EPA approved the State of Ohio Title V operating permit program. On October 1, 1995, the program became effective.

40.     Ohio EPA issued Title V Permit No. 07-73-00-0080 for the Haverhill Facility on January 5, 2005. The Haverhill Facility has subsequently operated under various Minor Permit Modifications, Administrative Amendments, and Significant and Minor Source Modifications to its Title V Permit.

41.     Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing

requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written.

42.     In 2015, ALTIVIA assumed the Title V permit for the Haverhill Facility through the purchase agreement pursuant to which it acquired the Facility during Haverhill Chemicals' bankruptcy proceeding that year. As such, ALTIVIA assumed all liabilities associated with the Title V permit and is liable for all non-compliance with the Title V permit, including non-compliance occurring prior to acquisition.

## C. Enforcement of the CAA

43.     CAA Section 113, 42 U.S.C. § 7413, authorizes EPA to commence a civil action for injunctive relief and/or civil penalties against any person who has violated any requirement or prohibition of the CAA or regulations promulgated thereunder, or who has violated any applicable permit or implementation plan.

44.     CAA Section 113(b), 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA. The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation. EPA adopted and revised regulations entitled *Adjustment of Civil Monetary Penalties for Inflation*, 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA. For each violation that occurs between January 13, 2009 and November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed; for each violation that occurs after November 3, 2015, penalties of up to $102,638 per day may be assessed. 73 Fed. Reg. 75,340 (Dec. 11, 2008); 78 Fed. Reg. 66,643 (Nov. 6, 2013); and 85 Fed. Reg. 83818 (Dec. 23, 2020).

## II.  CLEAN AIR ACT CLAIMS

### General Allegations

45.     ALTIVIA Petrochemicals, LLC is the "owner and operator," as defined in CAA

Section 112(a)(9), 42 U.S.C. § 7412(a)(9), of the Haverhill Facility in Haverhill, Ohio.

46.     The Facility constitutes a "stationary source" within the meaning of CAA

Sections 112(a)(3) and 302(z), 42 U.S.C. §§ 7412(a)(3) and 7602(z), and a "major source" of

HAPs within the meaning of CAA Section 112(a)(1), 42 U.S.C. § 7412(a)(1).

47.     The Haverhill Facility's Phenol II Unit, Phenol III Unit, and Regenerative

Thermal Oxidizer (RTO) are "chemical manufacturing process units" within the meaning of

Subpart F, 40 C.F.R. §§ 63.101(b) and 63.191, and are subject to Subparts F, G, and H of the

HON. *See* 40 C.F.R. §§ 63.100(b). These process units include "process vents" and "equipment"

within the meaning of 40 C.F.R. §§ 63.101 and 63.161, respectively.

48.     ALTIVIA has designated the Phenol II Unit, Phenol III Unit, RTO, and all other

affected process units and associated equipment as the chemical manufacturing process unit

(CMPU) for compliance with the HON.

49.     The CMPU manufactures phenol, a chemical listed in Subpart F, Table 1, as a

primary product. The CMPU processes or uses cumene, a hazardous air pollutant listed in

Subpart F, Table 2. The CMPU also manufactures acetone, a-Methylstyrene (AMS), and

Bisphenol A (BPA) as by-products of the process.

50.     EPA conducted an inspection of the Haverhill Facility on or about May 15, 2017

through May 18, 2017.

## FIRST CLAIM FOR RELIEF

### Failure to Control Process Vent 202-F
### Subpart G: 40 C.F.R. § 63.113(a)

51.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

52.     Pursuant to 40 C.F.R. § 63.107(a), an owner or operator must determine whether there are any process vents associated with an air oxidation reactor, distillation unit, or reactor that is in a source subject to Subpart F.

53.     Pursuant to 40 C.F.R. § 63.113(a)(2), an owner or operator of a Group 1 process vent must reduce emissions of total organic HAP by 98 weight-percent or to a concentration of 20 parts per million (ppm) by volume, whichever is less stringent. Compliance may be achieved by using any combination of combustion, recovery, and/or recapture devices.

54.     "Process vent" is defined as the point of discharge to the atmosphere (or the point of entry into a control device, if any) of a gas stream if the gas stream has the characteristics specified in Section 63.107(b) through (h), or meets the criteria specified in Section 63.107(i). 40 C.F.R. §§ 63.101(b), 63.107(a).

55.     Section 63.107(c) provides that a process vent includes discharges to the atmosphere from an air oxidation reactor, distillation unit, or reactor after passing solely through one or more recovery devices within the CMPU. 40 C.F.R. § 63.107(c).

56.     "Recovery device" is defined as an individual unit of equipment capable of and normally used for the purpose of recovering chemicals for, among other things, use or reuse. 40 C.F.R. § 63.111. The definition provides examples of equipment that may be a recovery device, including organic removal devices such as decanters.

57.     "Group 1 process vent" is defined as a process vent for which the vent stream flow rate is greater than or equal to 0.005 standard cubic meter per minute, the total organic HAP concentration is greater than or equal to 50 ppm by volume, and the total resource effectiveness index value, calculated according to 40 C.F.R. § 63.115, is less than or equal to 1.0. 40 C.F.R. § 63.111.

58.     From at least November 2015 through the present, the unit identified as tank 202-F has been used as a recovery device. Specifically, tank 202-F is used to decant sodium hydroxide (NaOH) / phenoxide from recycled cumene, so that the recovered cumene can be pumped back into the process. Recycled cumene initially contains trace phenol, which retards cumene hydroperoxide (CHP) reaction and can result in a safety hazard if reused in the phenol production process untreated. ALTIVIA adds NaOH to a recycled cumene and fresh cumene stream immediately prior to entry into tank 202-F. The added NaOH reacts with and separates trace phenol from the cumene in tank 202-F, with the NaOH/phenoxide solution settling out in tank 202-F prior to removal (*i.e.* decanting). From at least November 2015 through the present, tank 202-F has vented to the atmosphere uncontrolled.

59.     During EPA's March 2017 inspection, EPA personnel monitored tank 202-F at the vacuum breaker valve and gooseneck vent using a calibrated flame ionization detector to identify the total organic HAP concentration of emissions from tank 202-F and took instrument readings of 1,000 ppm and greater than 50,000 ppm respectively.

60.     Tank 202-F is a recovery device that constitutes a Group 1 process vent.

61.     From at least November 2015 through the present, ALTIVIA failed to control tank 202-F as a Group 1 process vent in violation of 40 C.F.R. § 63.113(a).

12

62.     Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violation of HON Subpart G identified in Paragraph 61, therefore, also constitutes a violation of the Facility's Title V permit.

63.     Unless restrained by an order of this Court, the violation of the CAA alleged in this First Claim for Relief will continue.

64.     As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

## SECOND CLAIM FOR RELIEF

### Failure to Perform Proper Method 21 Monitoring at Affected Valves
### Subpart H: 40 C.F.R. §§ 63.168(b), 63.180(b)

65.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

66.     Pursuant to 40 C.F.R. § 63.168(b)(1), the owner or operator of a source subject to Subpart H shall monitor valves to detect leaks by the method specified in Section 63.180(b). Section 63.180(b) requires the owner or operator to comply with requirements (1) through (6), set forth therein, including that monitoring shall comply with Method 21 of 40 C.F.R. Part 60, Appendix A. 40 C.F.R. § 63.180(b)(1).

67.     40 C.F.R. Part 60, Appendix A-7, Method 21, Section 8.3.1 requires an owner or operator to sample a valve where a leakage is occurring until the maximum meter reading is obtained.

68.     From 2013 through 2017, ALTIVIA and its predecessor asserted that the CMPU had a valve leakage rate of 0.5% or less.

69.     During EPA's May 2017 inspection, EPA found 18 leaking valves out of 805 inspected valves, equating to a 2.2% leak rate.

70.     A process unit's leak rate determines the allowable frequency of monitoring. HON Subpart H requires that process units with 0.5% leaking valves have the affected valves monitored once every four quarters. Process units with 2% or greater leaking valves must have the affected valves monitored once per month. 40 C.F.R. § 63.168(d). Because ALTIVIA reported a leak-rate of less than 0.5% for its valves, it only monitored those valves once every four quarters.

71.     EPA's identification of a valve leak rate more than 4-times larger than the leak rate reported by ALTIVIA shows that ALTIVIA improperly performed its Method 21 monitoring in violation of 40 C.F.R. §§ 63.168(b)(1) and 63.180 and failed to identify a significant number of leaks.

72.     Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of

14

HON Subpart H identified in Paragraph 71 therefore also constitute violations of the Facility's Title V permit.

73.     Unless restrained by an order of this Court, the violations of the CAA alleged in this Second Claim for Relief will continue.

74.     As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

### THIRD CLAIM FOR RELIEF

**Failure to Monitor Each Valve in Gas/Vapor Service or Light Liquid Service Once Per Year**
**Subpart H: 40 C.F.R. § 63.168**

75.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

76.     Pursuant to 40 C.F.R. § 63.168(a), an owner or operator of a process unit subject to Subpart H shall monitor all valves in gas/vapor service or in light liquid service at the intervals specified in 40 C.F.R. § 63.168(b).

77.     "In gas/vapor service" is defined as a piece of equipment in organic hazardous air pollutant service that contains a gas or vapor at operating conditions. 40 C.F.R. § 63.161.

78.     "In light liquid service" is defined as a piece of equipment in organic hazardous air pollutant service that contains a liquid that meets the following conditions: (1) the vapor pressure of one or more of the organic compounds is greater than 0.3 kilopascals at 20℃; (2) the total concentration of the pure organic compounds constituents having a vapor pressure greater

than 0.3 kilopascals at 20℃ is equal to or greater than 20 percent by weight of the total process stream; and (3) the fluid is liquid at operating conditions. *Id.*

79.     Pursuant to 40 C.F.R. § 63.168(d)(4), if the percentage of leaking valves in the process unit was less than 0.5% during the last required annual or biennial monitoring period, then an owner or operator shall perform all subsequent monitoring of valves at a frequency of no less than once per year (once every four quarters). ALTIVIA's HON Subpart H semi-annual reports state that ALTIVIA monitors valves once per year.

80.     ALTIVIA uses an LDAR Database to track monitoring events for valves in gas/vapor service and in light liquid service.

81.     ALTIVIA's LDAR Database shows that ALTIVIA missed annual monitoring at affected valves. Specifically, the LDAR Database (through 2016) shows that ALTIVIA missed monitoring at least 1,467 valves in 2015 and 178 valves in 2016.

82.     ALTIVIA's failure to monitor valves at the appropriate intervals in 2015 and 2016 is in violation of 40 C.F.R. § 63.168(a).

83.     Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of HON Subpart H identified in Paragraph 82 therefore also constitute violations of the Facility's Title V permit.

84.     Unless restrained by an order of this Court, the violations of the CAA alleged in this Third Claim for Relief will continue.

85.     As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

### FOURTH CLAIM FOR RELIEF

**Failure to Monitor Each Connector in Gas/Vapor Service or Light Liquid Service Once Per Year**
**Subpart H: 40 C.F.R. § 63.174**

86.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

87.     Pursuant to 40 C.F.R. § 63.174(a), an owner or operator of a process unit subject to Subpart H shall monitor all connectors in gas/vapor service and light liquid service at the intervals specified in 40 C.F.R. § 63.174(b).

88.     "In gas/vapor service" is defined as a piece of equipment in organic hazardous air pollutant service that contains a gas or vapor at operating conditions. 40 C.F.R. § 63.161.

89.     "In light liquid service" is defined as a piece of equipment in organic hazardous air pollutant service that contains a liquid that meets the following conditions: (1) the vapor pressure of one or more of the organic compounds is greater than 0.3 kilopascals at 20℃; (2) the total concentration of the pure organic compounds constituents having a vapor pressure greater than 0.3 kilopascals at 20℃ is equal to or greater than 20 percent by weight of the total process stream; and (3) the fluid is liquid at operating conditions. *Id.*

90.     Pursuant to 40 C.F.R. § 63.174(b)(3)(i), if the percentage of leaking connectors in the process unit was 0.5% or greater during the last required annual or biennial monitoring period, then an owner or operator shall perform all subsequent monitoring of connectors at a

frequency of once per year. A facility is required to identify its method of compliance with Section 63.174 in a Notification of Compliance Status (NOC) and subsequent Periodic Reports must provide any revisions to items reported in earlier NOCs if the method of compliance changes. *See* 40 C.F.R. §§ 63.182(c)(1)(iii) and 63.182(d)(4). ALTIVIA's NOC and Periodic Reports (HON Subpart H semi-annual reports) state that ALTIVIA monitors connectors at a frequency of once per year.

91.     ALTIVIA uses an LDAR Database to track monitoring events for connectors in gas/vapor service and in light liquid service. ALTIVIA's LDAR Database (through 2016) shows that ALTIVIA missed monitoring at affected connectors. Specifically, the LDAR Database shows that in 2015 ALTIVIA missed monitoring at least 3,442 connectors and it missed monitoring at least 1,932 connectors in 2016.

92.     ALTIVIA's failure to monitor connectors at the appropriate intervals in 2015 and 2016 is in violation of 40 C.F.R. § 63.174(a).

93.     Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of HON Subpart H identified in Paragraph 92 therefore also constitute violations of the Facility's Title V permit.

94.     Unless restrained by an order of this Court, the violations of the CAA alleged in this Fourth Claim for Relief will continue.

95.     As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

### FIFTH CLAIM FOR RELIEF

**Failure to Control Emissions from CHP and Phenol Individual Drain Systems
Subpart G: 40 C.F.R. § 63.136(a)**

96.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

97.     An "individual drain system" is defined as the stationary system used to convey wastewater streams or residuals to a waste management unit or to discharge or disposal. The term includes hard-piping, all process drains and junction boxes, together with their associated sewer lines and other junction boxes, manholes, sumps, and lift stations, conveying wastewater streams or residuals. 40 C.F.R. § 63.111.

98.     Pursuant to 40 C.F.R. § 63.136(a), an owner or operator shall comply with the requirements listed under (b)-(d) or (e)-(g) of that Section for each individual drain system that receives or manages a Group 1 wastewater stream or a residual removed from a Group 1 wastewater stream.

99.     An owner or operator who elects to comply with the requirements of 40 C.F.R. § 63.136 (b)-(d), must inspect each individual drain system initially, and semi-annually thereafter, for improper work practices and control equipment failures, in accordance with the inspection requirements specified in Table 11 of that Subpart. For individual drain systems,

control equipment failure includes, but is not limited to, any time a joint, lid, cover, or door has a gap or crack, or is broken. *See* 40 C.F.R. § 63.136(c).

100.    An owner or operator who elects to comply with the requirements of 40 C.F.R. § 63.136(e)-(g), must: (1) visually inspect each drain using a tightly fitting cap or plug initially, and semi-annually thereafter, to ensure caps or plugs are in place and there are no gaps, cracks, or other holes in the cap or plug; (2) visually inspect each junction box initially, and semi-annually thereafter, to ensure that there are no gaps, crack, or other holes in the cover; and (3) visually inspect the unburied portion of each sewer line initially, and semi-annually thereafter, for indication of cracks or gaps that could result in air emissions. *See* 40 C.F.R. § 63.136(f)(1)-(3).

101.    As detailed in the Facility's 1999 HON Subpart G Notice of Compliance Status (NCS), ALTIVIA owns and operates three individual drain systems at the Haverhill Facility, referred to as CHP1, CHP2, and Phenol Hubs. The 1999 HON Subpart G NCS identifies each of these individual drain systems as having average 40 C.F.R. Part 63 Subpart G Table 9 concentrations greater than 10,000 ppm. Each of these individual drain systems, therefore, receives and manages one or more Group 1 wastewater streams. *See* 40 C.F.R. §§ 63.111 and 63.132(c).

102.    ALTIVIA failed to determine that it owns and operates Group 1 wastewater individual drain systems subject to the requirements of 40 C.F.R. § 63.136 and failed to specify which set of requirements of 40 C.F.R. § 63.136 it would comply with at the individual drain systems.

103.    During EPA's May 2017 inspection of the Haverhill Facility, EPA identified several covers forming part of the individual drain systems that had gaps.

104.    ALTIVIA's failure to identify which inspection requirements it would follow under 40 C.F.R. § 63.136 resulted in ALTIVIA failing to adequately inspect its individual drain systems, and ALTIVIA's failure to identify covers with gaps allows uncontrolled HAP emissions to the atmosphere.

105.    From at least May 2017 through the present, ALTIVIA violated 40 C.F.R. § 63.136(a) by failing to comply with either 40 C.F.R. § 63.136(c) or (f).

106.    Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of HON Subpart G identified in Paragraph 105 therefore also constitute violations of the Facility's Title V permit.

107.    Unless restrained by an order of this Court, the violations of the CAA alleged in this Fifth Claim for Relief will continue.

108.    As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

## SIXTH CLAIM FOR RELIEF

**Failure to Control Emissions from Liquid Streams in CHP1, CHP2, and Phenol Open Systems**
**Subpart G: 40 C.F.R. § 63.149; Table 35**

109.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

110.     Pursuant to 40 C.F.R. § 63.149(a), the owner or operator shall comply with the provisions of Table 35 of Subpart G, for each item of equipment meeting all the criteria specified in 40 C.F.R. § 63.149(b)-(e). Pursuant to 40 C.F.R. § 63.149(e)(1), such equipment includes drains, drain hubs, manholes, lift stations, trenches, pipes, and oil/water separators that convey water with certain specified annual average concentrations of Table 9 compounds (10,000 ppm at any flowrate or 1,000 ppm at a flowrate of 10 liters/min or more). Cumene is a Table 9 compound. 40 C.F.R. Appendix Table 9 to Subpart G of Part 63.

111.     The 1999 HON Subpart G NCS for the Haverhill Facility states that the CHP1, CHP2, and Phenol Hubs are "open systems" managing liquid streams. These "open systems" are composed of drains, underground piping, drain hubs, trenches, sample lines, and sample collection vessels. The 1999 HON Subpart G NCS identifies each of these open systems as having average Table 9 concentrations greater than 10,000 ppm. The equipment associated with CHP1, CHP2, and Phenol Hubs open systems is subject to 40 C.F.R. § 63.149(a) and requires compliance with Table 35.

112.     Table 35 of Subpart G requires that drains, drain hubs, and trenches be controlled by either tightly fitting solid covers (TFSCs) or water seals. Table 35 of Subpart G requires that each pipe have no visible gaps in joints, seals, or other emission interfaces and that TFSCs be maintained with no visible gaps or openings.

22

113. During EPA's May 2017 inspection of the Haverhill Facility, EPA measured emissions at the drain hubs, sample collection vessels, sample lines, trenches, and covers of the CHP1, CHP2, and Phenol Hubs systems. EPA observed instrument readings ranging from 550 to 19,000 ppm and observed visual leaks at drain hubs, sample lines, and collection vessels. EPA also observed open valves at collection vessels and sample lines, and partially open drain hubs. These observations show that ALTIVIA failed to control emissions from liquid streams in the CHP1, CHP2, and Phenol open systems.

114. From at least May 2017 through the present, ALTIVIA's failure to control emissions from liquid streams in the CHP1, CHP2, and Phenol Hubs open systems, resulted in ALTIVIA's violation of 40 C.F.R. § 63.149.

115. Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of HON Subpart G identified in Paragraph 114 therefore also constitute violations of the Facility's Title V permit.

116. Unless restrained by an order of this Court, the violations of the CAA alleged in this Sixth Claim for Relief will continue.

117. As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R. § 19.4, the violations set forth above subject ALTIVIA to injunctive relief and civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

### SEVENTH CLAIM FOR RELIEF

**Failure to Control Group 1 Wastewater Streams for Table 9 Compounds at the Facility's
Open Biological Wastewater Treatment Unit
<u>Subpart G: 40 C.F.R. § 63.138(b)-(f)</u>**

118.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 50, as if fully set forth herein.

119.    Pursuant to 40 C.F.R. § 63.138(b)(2), an owner or operator shall comply with the requirements specified in any one of paragraphs (d), (e), (f), (g), (h), or (i) of that Section for the control of Table 9 compounds at new or existing sources. One listed option that an owner or operator may elect to comply with is the "required mass removal" (RMR) option. 40 C.F.R. § 63.138(f).

120.    RMR requires an owner or operator to achieve the required mass removal of Table 9 compounds at a new or existing source for a wastewater stream that is Group 1 for Table 9 compounds. For open biological treatment processes, compliance shall be determined using procedures specified in 40 C.F.R. § 63.145(f). *See* 40 C.F.R. § 63.138(f).

121.    A wastewater stream is determined to be a Group 1 wastewater stream for Table 9 compounds if: (i) the total annual average concentration of Table 9 compounds is greater than or equal to 10,000 ppm by weight at any flow rate; or (ii) the total annual average concentration of Table 9 compounds is greater than or equal to 1,000 ppm by weight and the annual average flow rate is greater than or equal to 10 liters per minute. *See* 40 C.F.R. § 63.132(c)

122.    An "open biological treatment process" is defined as a biological treatment process that is not a "closed biological treatment process," *i.e.* a tank or surface impoundment where biological treatment occurs and air emissions from the treatment process are not routed to either a control device by means of a closed vent system or to a fuel gas system by means of

hard-piping and/or the tank or surface impoundment lacks a fixed roof or floating flexible membrane cover. *See* 40 C.F.R. § 63.111.

123.    ALTIVIA owns and operates an open biological treatment process, as detailed in the 1999 HON Subpart G NCS, the 2000 HON Subpart G NCS for Phenol II, and the Title V permit for the Haverhill Facility. ALTIVIA's predecessor in liability elected to follow RMR and established a daily average chemical oxygen demand (COD) of less than or equal to 200 ppm to comply with the HON Subpart G control requirements. ALTIVIA has continued to follow RMR for compliance purposes.

124.    Between September 2017 and September 2019, ALTIVIA's semi-annual reports self-reported 27 exceedances of the daily average COD of 200 ppm.

125.    The exceedances identified in Paragraph 124 above are not allowed by the HON Subpart G and are violations of 40 C.F.R. § 63.138(b)(2).

126.    Part II Condition A. VII of the Haverhill Facility Title V Permit states that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written. The violations of HON Subpart G identified in Paragraphs 125 therefore also constitute violations of the Facility's Title V permit.

127.    Unless restrained by an order of this Court, the violations of the CAA alleged in this Seventh Claim for Relief will continue.

128.    As provided in CAA Section 113(b), 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 3701, and 40 C.F.R.

§ 19.4, the violations set forth above subject ALTIVIA to civil penalties of up to $102,638 for each violation occurring on or after November 3, 2015.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations contained in Paragraphs 1 through 128 above, the United States of America requests that this Court:

1.     Permanently enjoin ALTIVIA from operating its chemical manufacturing operations at the Haverhill Facility, except in accordance with the CAA and any applicable regulatory requirements;

2.     Order ALTIVIA to remedy the past violations at the Haverhill Facility by, among other things, complying with Subparts F, G, and H of Part 63 of Title 40 of the Code of Federal Regulations;

3.     Assess a civil penalty against ALTIVIA of up to $102,638 for each violation occurring on or after November 3, 2015;

5.     Award Plaintiff its costs of this action; and,

6.     Grant such other relief as the Court deems just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

 s/ Jeffrey A. Spector     , Trial Attorney
JEFFREY A. SPECTOR
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
(202) 514-4432

VIPAL J. PATEL
Acting United States Attorney
Southern District of Ohio
MATTHEW HORWITZ
Civil Chief
Southern District of Ohio
221 E. Fourth Street, Suite 400
Cincinnati, OH  45202
(513) 684-6823

OF COUNSEL:

CHARLES MIKALIAN
Associate Regional Counsel
EPA Region 5
Mail Code c-14J
77 West Jackson Blvd.
Chicago, IL  60604-3590
(312) 886-2242