## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:21-cv-640 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| ALTIVIA PETROCHEMICALS, LLC, | : | |
| Defendant. | : | |
| | : | |

**ORDER DENYING DEFENDANT'S PARTIAL MOTION TO DISMISS (Doc. 7)**

This civil action is before the Court upon Defendant's partial motion to dismiss (Doc. 7), an exhibit in support of the motion. (Docs. 6, 6-1), and the parties' responsive memoranda. (Docs. 8 and 10)

## I. FACTS <u>AS ALLEGED</u> BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to the Plaintiff; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

### A. General Background

The Plaintiff here is the United States of America ("the Government" unless another sub-entity is explicitly referenced), which brings a civil action, pursuant to 42 U.S.C. § 7413, to enforce the Clean Air Act ("CAA") and compliance with an applicable permit. (Doc. 1). Defendant is Altivia Petrochemicals LLC ("Altivia"), a limited liability

1

company that owns and operates a petrochemical manufacturing facility in Haverhill, Ohio (the "Haverhill facility"). (*Id.* at ¶¶6, 45). In 2015, Altivia acquired the Haverhill facility out of bankruptcy and assumed liabilities under the permits assigned to it through an asset purchase agreement. (*Id.* at ¶7). Altivia restarted operations at the Haverhill facility in 2015. (*Id.* at ¶8).

At the Haverhill facility, Altivia makes an organic compound called "phenol." (*Id.* at ¶47). The phenol-making process also produces hazardous air pollutants ("HAPs"), including, as is notable here, a by-product HAP called "cumene." (*Id.* at ¶49). The cumene emissions subject the Haverhill facility to several regulations promulgated under the CAA. (*Id.* at ¶¶45, 46). Specifically, the Haverhill facility must comply with the regulations known as the "National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry" (customarily reduced to "HON"). (*Id.* ¶¶19, 47-48).[1] Altivia has designated certain Haverhill facility equipment as "chemical manufacturing process units" (CMPU). (*Id.* at ¶48). These CMPUs must comply with HON. (*Id.*). HON imposes obligations on Alitiva to, *inter alia*, monitor and maintain its CMPU. (*Id.* ¶¶20-32).

Importantly, Altivia operates the Haverhill facility under a Title V permit. (*Id.* at ¶40). The Environmental Protection Agency (EPA) approves state-level permitting

_____

[1] HON is codified at 40 C.F.R. §63, Subparts F, G, H, and I.

programs for Title V permits. (*Id.* at ¶39). Alitiva's permit was issued by the Ohio permitting program pursuant to Ohio's State Implementation Plan ("SIP")—state regulations that guide permitting and generally track the CAA. (*Id.* at ¶40). Altivia's permit states "that the permittee is subject to the applicable emission limitation(s) and/or control measures, operational restrictions, monitoring and/or record keeping requirements, reporting requirements, testing requirements, and the general and/or other requirements specified in 40 C.F.R. Part 63, Subparts F, G, and H, which are incorporated into the Title V permit as if fully written." (*Id.* at ¶41).

In 2017, the EPA inspected the Haverhill facility. (*Id.* at ¶50). The EPA found the facility allegedly out-of-compliance with several regulations incorporated into its permit. These compliance issues set the framework for the Government's complaint. The Court reviews the factual allegations claim by claim.

### B. Failure to Control Tank 202-F as a Process Vent (Claim 1)

The Government's first claim centers on the function of a piece of equipment called "tank 202-f." (*Id.* at ¶¶51-64). Simplifying things for clarity, the Government alleges the "tank" is properly considered a "vent," because it emits HAPs directly to the atmosphere. (*Id.*). Altivia has failed to regulate the tank as if it were a vent. (*Id.*). Specifically, Altivia has not reduced the emissions from tank 202-f by 98 percent or reduced the HAP concentration to 20 parts per million. (*Id.* at ¶53).

Tank 202-F, among other seeming functions, "decants" cumene, a HAP, from other chemical compounds. (*Id.* at ¶41). Tank 202-f then recycles the cumene for further

use in the chemical process. (*Id.*). For this reason, the Government describes tank 202-f as a "recovery device." (*Id.* at ¶55; *see also* 40 C.F.R. §63.107(c)). Because of the observed capacity to vent HAPs directly to the atmosphere after passing through a recovery device, the Government alleges that tank 202-f is a Group 1 process vent, subject to subpart F of the HON (*id.* at ¶¶59-62), and that Altivia has failed to take steps to control tank 202-f as a process vent.

### C. Failure to Perform Proper Method 21 Monitoring at Affected Valves (Claim 2)

This claim centers on allegations regarding the rate at which CMPU valves leak. The regulatory backdrop is relatively straightforward. (*Id.* at ¶¶65-75). HON establishes the valve leak rate as a determinant of monitoring frequency. (*Id.* at ¶70). A valve leak rate of 0.5% requires monitoring once a year (or, specifically, once every "four quarters."). (*Id.*). A valve leak rate of 2.0% of greater requires monthly monitoring. (*Id.*, *see also* 40 C.F.R. § 63.168(b)(1)).

The Government alleges that Altivia and its predecessor reported a leak rate 0.5% or less from 2013 to 2017. (Doc 1 at ¶68). When the Government inspected in May 2017, it measured a 2.2% leak rate. (*Id.* at ¶69). The Government states that its "identification of a valve leak rate more than four-times larger than the leak rate reported by ALTIVIA shows that ALTIVIA improperly performed its Method 21 monitoring in violation of 40 C.F.R. §§ 63.168(b)(1) and 63.180 and failed to identify a significant number of leaks." (*Id.* at ¶71).

### D. Failure to Monitor Each Valve in Gas/Vapor Service or Light Liquid Service Once Per Year (Claim 3)

The Government alleges that Altivia failed to perform yearly monitoring of valves in "gas/vapor service" and "in liquid light service," as required by HON. (*Id.* at ¶¶75-85). The Government bases this claim on Altivia's own reporting in its Leak Detection and Repair Database ("LDAR"). (*Id.* at ¶80). The LDAR "shows that ALTIVIA missed annual monitoring at affected valves." (*Id.* at ¶81). "Specifically, the LDAR Database (through 2016) shows that ALTIVIA missed monitoring at least 1,467 valves in 2015 and 178 valves in 2016." (*Id.*).

### E. Failure to Monitor Each Connector in Gas/Vapor Service or Light Liquid Service Once Per Year (Claim 4)

Replacing "valves" with "connectors," the gist of the allegations in Claim 4 are the same as those in Claim 3. (*Id.* at ¶¶86-95). Specifically, Altivia failed to perform annual monitoring of several connectors, as regulated under 40 C.F.R. §63.174. (*Id.*). As the Government specifically puts it, "the LDAR Database shows that in 2015 ALTIVIA missed monitoring at least 3,442 connectors and it missed monitoring at least 1,932 connectors in 2016." (*Id.* at ¶91).

### F. Failure to Control Emissions from CHP and Phenol Individual Drain Systems (Claim 5)

Regulations establish multiple methods to confirm compliance with "individual drain systems." 40 C.F.R. §63.136(a). The Government identifies the individual drain systems as "CHP" and "Phenol Hub." (*Id.* at ¶101). As of 1999, based on a Notice of

Compliance seemingly submitted by Altivia's predecessor, these individual drain systems allegedly contain a "Group 1 wastewater stream" because of the volume of Organic HAPs that flow through them. (*Id.* at ¶101; *see also* 40 C.F.R.§ 63, Subpart G, Table 9). Individual drain systems that receive or manage a Group 1 wastewater streams are subject to self-inspection requirements. (*Id.* at ¶99, *see* 40 C.F.R.§ 63.136 (b)-(d)).

The Government claims that Altivia has not identified its individual drainage systems as servicing Group 1 wastewater streams.  (*Id.* at ¶101).  Altivia has therefore not indicated which mode of compliance it adopts with regards to the wastewater stream regulations. (*Id.* at ¶102).   During its inspection, moreover, the Government alleges to have found gaps in the covers of individual drain systems. (*Id.* at ¶103).

Particularly, the Government states: "ALTIVIA's failure to identify which inspection requirements it would follow under 40 C.F.R. §63.136 resulted in ALTIVIA failing to adequately inspect its individual drain systems, and ALTIVIA's failure to identify covers with gaps allows uncontrolled HAP emissions to the atmosphere." (*Id.* at ¶104).

### G.  Failure to Control Emissions from Liquid Streams in CHP1, CHP2, and Phenol Open Systems (Claim 6)

This claim centers on Altivia's management of its "open systems." (*Id.* at ¶¶109-117).  "These open systems are composed of drains, underground piping, drain hubs, trenches, sample lines, and sample collection vessels." (*Id.* at ¶111)  The applicable regulation "requires that each pipe have no visible gaps in joints, seals, or other emission

interfaces and that [tight fitting cover seals] be maintained with no visible gaps or openings." (*Id.* at ¶112). The Government's inspection revealed visible gaps, leaks and emissions in these open systems. (*Id.* at ¶113).

Altivia's motion does not seek dismissal of a seventh Government claim. For all claims, the Government seeks both civil penalties and injunctive relief.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id*. (citing Fed. R. Civ. P. 8(a)(2)).

### III. ANALYSIS

Broadly speaking, Altivia's motion to dismiss raises three arguments. These arguments may be fairly categorized as: the permit shield defense, pleading insufficiencies, and the fair notice doctrine. The Court conducts its analysis by reference to Altivia's argument, specifying which claim it attacks.

### A. Permit Shield (in support of dismissal of Claims 1 and 5)

The permit shield defense is established by federal law, federal regulations, the SIP (in this case, codified by Ohio regulations), and the permit itself. To give a clear sense of the permit shield, as it applies in this case, the Court analyses the framework in depth, staring with 42 U.S.C. §7661c, the statutory authority for the permit shield, which states:

Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title. Except as otherwise provided by the Administrator by rule, the permit may also provide that compliance with the permit shall be deemed compliance with other applicable provisions of this chapter that relate to the permittee if--

(1) *the permit includes the applicable requirements* of such provisions, or

(2) the permitting authority in acting on the permit application makes a determination relating to the permittee that such other provisions (which shall be referred to in such determination) are not applicable and the permit includes the determination or a concise summary thereof.

42 U.S.C. § 7661c (emphasis added).

Interpreting these regulations, the Government, acting through the EPA, has promulgated a regulation stating that a permitting authority may expressly include in the permit:

a provision stating that compliance with the conditions of the permit shall be deemed compliance with any applicable requirements as of the date of permit issuance, *provided that*:

(i) Such *applicable requirements are included and are specifically identified in the permit*; or

(ii) The permitting authority, in acting on the permit application or revision, determines in writing that other requirements specifically identified are not applicable to the source, and the permit includes the determination or a concise summary thereof.

40 C.F.R. § 70.6 (emphasis added).

The Court here pauses to summarize the framework. Federal law authorizes the permit shield and places limitations on it. But it is the permitting authority that is to "expressly include" the shield on any permits. A second important point regards the language, included both in the statute and the regulation, suggesting that a permit shields the permittee from requirements *identified* on the permit.

9

Nowhere, however, does the statute or regulation state that compliance with a permit's terms automatically equates to compliance with all applicable requirements of the CAA.  Such a conclusion would cast off the important condition that applicable requirements from which the permittee is shielded are specifically identified by the permit or specifically determined as inapplicable by the permitting authority.

The Ohio SIP makes the inclusion of a permit shield mandatory on all Title V permits but otherwise follows in step with federal law and regulations.  Specifically, the Ohio SIP states, "[e]ach permit issued under this rule shall include a permit shield provision, which shall state that compliance with the terms and conditions of the permit shall be deemed compliance with the applicable requirements *identified* and *addressed* in the permit *as of the date of permit issuance*." Ohio Admin. Code 3745-77-07 (F)(1) (emphasis added).  The next paragraph provides for a procedure that would allow the permittee to obtain a determination that certain requirements do not apply.  *Id.* at (F)(2).

Finally, it is worth noting that Altivia's permit itself echoes this framework.  (*See* Permit Final Title V Significant Permit Modification, Doc. 7-1). The permit states that:

> Compliance with the terms and conditions of this permit (including terms and conditions established for alternate operating scenarios, emissions trading, and emissions averaging, but excluding terms and conditions for which the permit shield is expressly prohibited under OAC rule 3745-77-07) shall be deemed compliance with the applicable requirements *identified* and *addressed* in this permit *as of the date of permit issuance*.

(*Id.* at §13.a) (emphasis added).

Altivia argues that its permit shield protects it from any liability resulting from claim 1 (regarding the alleged failure to apply vent control regulations to tank 202-f) and

claim 5 (failure to control emissions from individual drain systems). Before examining the permit shield argument as applied to the equipment specifically, the Court first addresses an important threshold debate about the shield—whether the scope of the permit shield is at least partially determined by the information provided to the permitting authority.

Altivia states that "[u]nder the permit shield provision, compliance [with the permit] shall be deemed compliance with all applicable Clean Air Act provisions, including the HON." (Doc. 7 at PageID# 67); *see also United States v. EME Homer City Generation*, L.P., 727 F.3d 274, 280 (3d Cir. 2013). Proceeding from this view, Altivia further argues any attempt to use an enforcement proceeding, such as the present one, to correct a deficiency in the permit is an impermissible "collateral attack" on the permit. (*See* Doc.7 at PageID# 69 (citing *EME Homer City*, 727 F.3d at 296-97). Altivia states that, as in contract law, the Court should only examine extrinsic information if the permit provision is ambiguous. (Doc. 11 at PageID# 140 (citing *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 269 (4th Cir. 2001)). Altivia concludes that the permit is unambiguous and there is no reason to examine the information provided to the Ohio permitting authority. (Doc. 11 at PageID# 143).

The Government takes the view that the information provided to the permitting authority is relevant to the scope of the resulting permit shield. (Doc. 8 at PageID# 87). In support, the Government cites *U.S. v. Murphy Oil*, a federal district court case from Wisconsin. *See* 143 F. Supp. 2d 1054 (W.D. Wis. 2001). Among several other claims,

11

the *Murphy Oil* court analyzed the permit shield's application to a "sulfur recovery unit"
for which the defendant had allegedly not provided accurate information to the permitting
authority.  The court in *Murhpy Oil* found that "[b]ecause this [permit shield] defense
depends upon whether defendant failed to disclose pertinent information, that
determination cannot be made before trial because the facts are in dispute.  *United States
v. Murphy Oil USA, Inc*., 143 F. Supp. 2d 1054, 1093 (W.D. Wis. 2001).

In an ensuing analysis, among several other points, the *Murphy Oil* court responds
to the argument that if the permit is somehow incorrect, modification, rather than an
enforcement action, is the means to correct it.  The court in *Murphy Oil* determinesd that
in  the event of the permittee's failure to disclose relevant information, this argument
would be "wholly unconvincing."  143 F. Supp. 2d at 1095.  "If information was
withheld," the *Murphy Oil* court continues, "the Government would have had no reason
to know of any need for modifying the permit when it was reviewing the permit and
application documents." *Id.*

With seemingly no binding authority provided to it, this Court finds the *Murphy
Oil* approach—information provided to the permitting authority may be relevant to the
permit shield defense—most persuasive.  Three reasons are particularly compelling.

First, *Murphy Oil* is most on-point for the present case.  It directly addresses why
information provided to the permitting authority is relevant to the scope of the
permittee's shield. 143 F. Supp. 2d at 1093.  It further speaks to a factual situation
similar, in relevant part, to the case at bar.  Here, the Government's observations of the

facility are allegedly at-odds with seeming assumptions made by the permit. Thus, in both cases, the allegations give rise to the possibility that the permit, as written, reflects inaccurate information provided in the permitting process.

On the other hand, many of the Altivia-cited cases pay lip service to the permit shield but side-step the question of its scope in favor of a jurisdictional ruling.[2] Jurisdiction is not argued by Altivia here and the Court, on its own review, is satisfied that it is not in question.[3] Simply put, *Murphy Oil* gives a persuasive answer to the question at-issue here, and Altivia fails to counter the reasoning or distinguish the present case.

Second, the Court finds common sense in the *Murphy Oil* reasoning that the permitting authority, in issuing a permit, is hemmed in by what is provided to it by the permit applicant. The permit issuance process has built-in mechanisms for public participation and EPA review. *See* Ohio Admin. Code 3745-77-08. What it does not have, so far as this Court can tell, is any mechanism to determine the truthfulness of basic

---

[2] *See e.g.*, *EME Homer City Generation*, 727 F.3d at 300 n.9 (3d Cir. 2013) ("But these permit shields are merely sideshows. Even assuming the EPA is correct that neither permit shield protects the Current Owners, the availability of this defense has no bearing on whether § 7607 strips district courts of jurisdiction over collateral challenges to Title V permits."); *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 756 (9th Cir. 2008); ("Because Plaintiffs' action was brought in an inappropriate forum under an inapplicable CAA provision in an untimely avenue of protest, the district court was without jurisdiction to hear it.); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1022 (8th Cir. 2010) ("While § 7661c(f) [the permit shield] is a statutory defense to liability, § 7607(b)(2) limits district court subject matter jurisdiction. To the extent the two provisions are in tension, the jurisdictional limit is paramount."

[3] In short, the Court finds jurisdiction is clearly proper under 42 U.S.C. § 7413(b), because the Government is attempting to enforce regulations incorporated by the permit itself.

representations made on the permit application.  *Id.*  Absent a proper adversarial fact-finding mechanism in the permit procedure, it makes sense to allow a plaintiff in a permit enforcement action to examine what was in front of the permitting authority.  Conversely, it would reward bad-faith behavior to say a permittee who has falsified its permit application—not a direct allegation here—is only subject to a modification or revocation of the permit.

Third, as will be discussed in more-depth below, accepting the Government's allegations about the facility as true, the Court finds the scope of the permit shield as applied to the facts is ambiguous.  Thus, the Court finds it is appropriate to determine the proper scope of the permit with reference to the permitting materials.  As will be seen, Altivia's assertion that the permit is unambiguous and clear is not well-taken.

Because the Government's allegations give rise to the possibility that inaccurate information was provided to the permitting authority, the Court finds that the materials submitted to the permitting authority by Altivia or its predecessors are indeed relevant to determining the scope of the permit shield defense.[4]  This determination, on its own, would suffice to reject Altivia's motion as it relates to its permit shield defenses.  For

---

[4] In reply, Altivia argues that the Government's response improperly adds new allegations to the complaint because the Government suggests the information provided to the permitting authority may have been inaccurate. (Doc. 11 at PageID# 147).  The Court finds nothing untoward in the Government's response in opposition. (Doc. 8).  Altivia has raised a permit shield defense.  The Government responds to that defense by stating that the information provided to the permitting authority may be relevant to the scope of the permit shield so a motion to dismiss would be premature.  The Government is not seeking to hold a permit-falsifier accountable.  In other words, the Government's opposition is legal argument directed to the permit shield defense.  It does not add new allegations.

14

completeness, the Court reviews the permit shield arguments as applied to the specific devices at issue.

### 1. *The Permit Shield and Tank 202-f (Claim 1)*

The Government's allegation is that tank 202-f emits HAPs to the atmosphere such that it should be regulated like a "vent" and "controlled" under 40 C.F.R. §61.113(a). This would require a 98% reduction of the HAP by weight or a significant reduction of the emissions potency. This allegation is based on the Government's observation and measurement during its inspection.

Altivia argues that the tank 202-f is considered a "surge control vessel" on the permit. (Doc. 7 at PageID# 68). More importantly, Altivia argues, the permit explicitly states tank 202-f is "uncontrolled." (*Id.*). Altivia concludes that "surge control vessel" regulations apply to tank 202-f and that "process vent" regulations absolutely do not—regardless of how tank 202-f is now operating. (*Id.*). Furthermore, because the permit states that tank 202-f is "uncontrolled," Altivia does not need to curb emissions from tank 202-f whatsoever. (*Id.* at PageID# 66).

The structure of the permit is important here. To start, according to the Government, an enumerated "condition" of the permit states that 40 C.F.R. §63, Subparts F, G, and H—the HON—are incorporated into the permit "as if fully written." (Doc. 1 at

¶115).[5]  This would naturally incorporate the obligation to properly control group 1

process vents.  The permit also states the obligations to control process 1 vents generally,

without reference to tank 202-f. (Doc. 6-1, PageID# 45).  Just as Altivia says, the permit

then lists tank 202-f as an "uncontrolled device." (*Id.*).  Yet another section of the permit

specifically identifies tank 202-f as a "surge control vessel." (*Id.* at PageID#68).  As

Altivia quotes this section, supplying helpful bracketed annotations, it reads:

> In accordance with the permittee's permit application [t]he following surge control
> vessels and bottoms receiver tanks do not exceed the threshold triggers
> of 40 CFR 63.170 [requiring the capture and control of emissions from vessels
> exceeding specified capacities and vapor pressures].  Therefore, these vessels are
> not required to meet the [control requirements] listed in 40 CFR 63.170 at the time
> of permit issuance: 206-FA, 206-FB, 202-F, and 3232-F.

(Doc. 7 at PageID# 68).

Again, Altivia's argument is that because tank 202-f is expressly identified as a

"surge control vessel" on the permit, it does not necessitate controls to emissions that a

process vent would.  Altivia also argues that "[t]he Permit's express language permitting

202-F as 'uncontrolled' directly contradicts Claim 1's allegations, which all rest on the

express claim that 202-F is subject to § 63.113(a)'s emission control requirements [for

process vents]." (*Id.*).  Altivia continues, "[t]his alone—the clear fact that the government

---

[5] For what it is worth, the permit is provided by Altivia only in excerpted form. (Doc. 7-1).  The
Government does not dispute the accuracy of those portions, but the Court is unable, for now, to
review the portions of the permit that incorporate the HON.  Altivia does not dispute that these
incorporation provisions exist and the Court must regard well-pleaded facts as true.
Accordingly, the Court is satisfied that a provision of the permit's "conditions" incorporates the
regulations of the HON, as stated in the complaint.

grounds its case on obligations to control 202-F's emissions while the Permit expressly states 202-F is uncontrolled—is sufficient to dismiss Claim 1 for failure to state a plausible claim." (Doc. 7 at PageID# 68).

The Court does not agree. Altivia's argument relies on the unproven assumption that the permit regards tank 202-f as uncontrolled for all purposes. Such an interpretation is at-odds with the both the permit and the larger regulatory structure. The permit's second reference to tank 202-f identifies exactly what "controls" it is exempt from: the control requirements for surge control vessels.

But the Government's allegation is not that Altivia is in violation of the control requirements for surge control vessels. *See* 40 C.F.R. §63.170. Rather, the Government's allegation is that tank 202-f emits directly to the atmosphere and thus violates regulations set out for *process vents*. *See* 40 C.F.R. §61.113(a). The process vent regulations are both incorporated into the permit by reference. Moreover, the permit does not identify tank 202-f as in compliance with the process vent regulations §61.113(a). Nor has the permitting authority, so far as this Court is aware, stated in writing that §61.113(a) is inapplicable to tank 202-f in particular or the Haverhill facility in general. Accordingly, the Court cannot conclude, as a matter of law, that the permit shield protects tank 202-f from the generally applicable process-vent obligations imposed by §61.113(a), which are incorporated in the permit.

Altivia's supplemental argument that if tank 202-f is a surge control vessel it cannot possibly be a vent is also unpersuasive. Altivia's argues that because tank 202-f is

recited on the permit as a "surge control vessel," it cannot be regulated as a "group 1 process vent." The Court notes there is no authority cited by either party on whether equipment categorizations recited by a permit are exclusive, pre-emptive, and static. But there are common sense reasons to believe they are not. For the reasons analyzed below, this Court finds it is plausible that a "surge control vessel" may also be regarded as a "group 1 process vent."

Initially, the HON definitions themselves provide no reason to believe the categories of group 1 process vents and surge control vessels are mutually exclusive. A group 1 process vent is defined by objective, numerical criteria—most notably, the rate at which it emits HAPs, the very thing the Government accuses tank 202-f of doing. *See* 40 §61.113(a). Otherwise, it is an open category, admitting of no exclusions for "tanks." Thus, at this preliminary phase, the Court is more inclined to credit the Government's contention that tank 202-f should be regulated based on what it *does* rather than what it is *named*.[6]

Also, Altivia's argument for category essentialism, widely adopted, would have troubling consequences for Title V permitting and CAA enforcement. The bad-faith scenario is not difficult to imagine. A permit aspirant submits applications describing a non-emitting "tank." On that basis, it receives a permit stating that it does not need to

---

[6] It seems entirely plausible that the same basic setup could be operated such that a device like tank 202-f could be considered an "emissions unit"—or not. *United States v. Westvaco Corp.* discusses the complexities of a similar question at length, albeit not in the context of the HON. *See* 675 F. Supp. 2d 524, 534 (D. Md. 2009).

control emissions from the tank.  After receiving the permit, the now-permittee places a vent on the tank that causes the equipment to vent to the atmosphere.  The permittee now wards off any enforcement action on the basis that the tank cannot be a vent because the permit says it is a tank.  The Court is aware of no way it could adopt the breadth of Altivia's proposed shield without implicitly providing a similar shield to the hypothetical bad-faith actors here supposed.

Ultimately, the permit's shield coverage for tank 202-f is ambiguous.  The Court acknowledges Altivia's argument that other "process vents" are specifically identified in the permit, so, to paraphrase, the permit could have, but did not, identify tank 202-f as a process vent. (*See* Doc. 7 at PageID# 68).  At the same time, this Court must also credit the Government's allegations that tank 202-f is operating like a vent as of a 2017 inspection and that the regulations governing process vents are explicitly incorporated as a "condition" of the permit.  At this stage, looking at all this information at once, the Court finds there is ambiguity in whether and how the permit shield applies to the facts. Because of this ambiguity, the Court determines extrinsic evidence—inclusive of the permitting record—could shed light onto the scope of the permit shield.  For this reason, Altivia's motion is premature on this point.

Citing some authorities, Altivia further argues this enforcement action is an impermissible "collateral attack" on the permit. (Doc. 7 at PageID#79).  Alas, the Court agrees with the *Murphy Oil* court in that an enforcement action cannot just be waived away as a collateral attack "unless the permit is based upon accurate information." 143

F.Supp.2d at 1092. That accuracy remains to be established in this case. Moreover, unlike the enforcement actions and citizen-suit cases cited in support by Altivia, the Government here is not trying to modify the permit and is not claiming the permit, as written, fails to meet the standards of the CAA or the SIP. *See e.g., Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1020 (8th Cir. 2010). Instead, the Government argues the HON-imparted obligations to control process 1 vents are incorporated into the permit as if fully written. The Government is enforcing those incorporated regulations and thus enforcing the permit—not attacking it.

This Court must accept the Government's well-pleaded allegations as true. Here, the Government has plausibly pleaded that tank 202-f operates like a vent because, among other reasons, it emits HAPs to the atmosphere. The Court will not extend the permit shield to block this claim just because the permit recites that tank 202-f is a "surge control vessel" and "uncontrolled." Moreover, for reasons stated, the Court finds that information in the permitting record is relevant to the scope of the permit shield, especially here where the permit is ambiguous as applied to the well-pleaded facts.

### 2. *The Permit Shield and CHP1, CHP2 and Phenol Hub (Claim 5)*

Altivia uses a similar permit shield defense against the Government's claims regarding Altivia's individual drain systems. The complaint identifies these individual drain systems as "CHP1, CHP2 and Phenol Hub." (Doc. 1 at ¶101). A 1999 Notice of Compliance suggests these individual drain systems carry a specified substance—as listed in HON subpart G, table 9—in a concentration that exceeds 10,000 ppm. This

20

heightened concentration puts the streams into the category of "wastewater."  The Government says Altivia has not properly regulated emissions from these wastewater streams in accordance with applicable regulations.  The Government adds that its own visual inspection revealed gaps in the individual drain systems.

There are two sets of regulations at-issue—40 C.F.R. §63.149 (governing "process water") and §63.136 (governing "wastewater").  The permit explicitly subjects the at-issue systems to the process water regulations.  Without reference to any particular drain systems, the permit also generally requires compliance with "the applicable requirements for individual drain systems as specified in §63.136[.]" (Doc. 6-1 at PageID# 51).

Altivia reprises its category exclusivity argument.  "[T]he fact that the Permit expressly subjects CHP1, CHP2, and the Phenol Hubs to § 63.149 demonstrates that these are not also subject to § 63.136," Altivia argues. (Doc. 7 at PageID# 71).  Here again, the assertion lacks a citation or an argument via an analogous case.  Again, the Court is left wondering why it is true, as a matter of law, that a permit that explicitly subjects equipment to one set of regulations *necessarily* exempts it from another set of otherwise-applicable, incorporated regulations.  Here again, where the permit mentions both sets of regulations, it seems reasonable that a system may be subject to both a specifically identified regulation as of the time of permit issuance and/or to a generally-stated, incorporated regulation, *depending on how the system is operating.*

There is no reason to revisit each point in the permit shield analysis already conducted.  Here, as with tank 202-f, the Court finds the permit is at least ambiguous as

to whether it would shield CHP1, CHP2, and Phenol hubs from regulations as individual drain systems. Accordingly, Altivia is not entitled to dismissal of this particular claim.

Altivia does raise a unique argument with regards to CHP1, CHP2 and the Phenol hubs. Altivia states that the wastewater provision at §63.136 only applies to individual drain systems that receive or manage "wastewater." (Doc. 7 at PageID# 71). According to 40 C.F.R. §63.101, wastewater is defined by two elements. It must be above a threshold concentration of regulated compounds *and* it must be "discarded" from a CMPU. 40 C.F.R. §63.101. So, if the water stream is not discarded from a CMPU, it cannot be an individual drainage system that carries wastewater. In that scenario, §63.136—the regulation the Government seeks to enforce—would be inapplicable. With that much, and absent contradicting argument from the Government, the Court agrees with Altivia.

Alas, for Altivia, a factual dispute remains. The Government's complaint states that CHP1, CHP2, and Phenol Hubs are individual drain systems. Individual drain systems definitionally carry wastewater. *See* 40 C.F.R. § 63.111. The Court regards the Government's allegations that CHP1, CHP2 and Phenol Hubs function as individual drain systems as well-pleaded. If Altivia can show this equipment does not contain water discarded from a CMPU, the Court (or a jury) may well find the same equipment is not subject to the requirements of wastewater systems outlined in §63.136. But the relevant facts remain to be established, one way or the other. For now, there is no basis to dismiss this claim on a 12(b)(6) motion.

It is still possible that Altivia's permit shield will be a successful defense.  At this point, factual questions remain.  For that reason, the Court will not grant Altivia's motion to dismiss based on its permit shield arguments.

### B.  The Complaint Alleges Insufficient Facts (in support of dismissal of claims 2, 3, and 4)

Altivia attacks claims 2, 3 and 4 on the basic premise of pleading insufficiency. The Court reviews the argument as applied to each claim in turn.

#### 1.  *Pleading Sufficiency for Frequency of Leak Valve Rate and Required Monitoring (Claim 2)*

Claim 2 is a straightforward accusation about the frequency of monitoring factory valves for leaks.  According to HON, a baseline leak rate below 2% requires no more than yearly monitoring.  A baseline leak rate above 2% requires monthly monitoring. The leak monitoring must take place in accordance with a standard called "Method 21," outlined in the 40 C.F.R. 60, Appendix A.  The Government observed the Haverhill Facility's leak rate of 2.2%.  That rate was four times the amount Altivia had reported. On this basis, the Government alleges Altivia failed to perform Method 21 monitoring. The Court finds the Government's allegation that Altivia has not performed proper valve leak monitoring is plausible because it has pleaded factual content that allows the Court to draw the reasonable inference that the "defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Altivia's arguments are not well-taken.  Altivia starts by pointing out that "[n]o allegations are offered regarding the manner and means by which EPA found the leaks."

23

(Doc. 7 at PageID# 73). The Court can find no reason to require a blow-by-blow description of an inspector's "manner and means" in a complaint. At this stage, detailed allegations are not necessary. Moreover, the inspector's findings are simply a foundation on which to rest actual complaint that Altivia is not properly monitoring its valves. By attacking an inspector's methods, Altivia seems to mistake the claim for its factual foundation. Given the facts pleaded, the Government's claim that Altivia has improperly monitored its valves is plausible.

Altivia also argues the Government's inspection is a "snapshot" in time, whereas leak rates are reported on a two-quarter rolling average. (Doc. 7 at PageID#73). This argument is meant to undermine the reliability of the Government's measured 2.2% leak rate. However, the Court is content to draw inferences from the sheer gulf between the Government's observed leak-rate and the yearly reports from Altivia or its predecessor. From 2013 to 2017, according to the Government, Altivia or its predecessor reported the valve leak rate at 0.5% or less. As of May 2017, based on the inspection, the Government found a leak rate four times what had been reported. Altivia or its predecessor reported the low leak rate triggering less frequent monitoring not once—but in each of the previous four years. While the Court is not currently aware of how many total valves are in the Haverhill facility, plain logic would determine that rolling averages

are unlikely to smooth out such a discrepancy.[7]

Citing *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, Altivia next contends that "where a complaint alleges facts that are merely consistent with liability, the existence of *obvious* alternative explanations for those facts can demonstrate that the plaintiff has failed to plausibly allege its claims." (Doc. 7 at PageID# 74; *see* 727 F.3d 502, 505 (6th Cir. 2013) (emphasis added). Altivia continues, "it is plausible that conditions varied between the time of ALTIVIA's monitoring and EPA's inspection." (*Id.*).

But plausible, as Altivia describes its alternative scenario, is a far cry from "obvious." And, for reasons already stated, the Court finds it unlikely the Government's "snapshot" simply caught Altivia at a bad moment. This is especially true at this stage where the Court must regard the complaint in a light most favorable to the Government. The Court will not engage further with various alternative possibilities put forth by Altivia, but Altivia is free to establish them as defenses. At the moment, Altivia is not entitled to dismissal of this claim.

---

[7] Altivia cites a 2nd Circuit antitrust case in support of the idea "that for facts to make a claim plausible, they must bear a rational relation to the legally prescribed methodology for determining whether or not the defendant violated the law." *Todd v. Exxon* Corp., 275 F.3d 191, 200. A quote from that same case suggests that the court was engaged in an antitrust specific inquiry: "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes— analysis of the interchangeability of use or the cross-elasticity of demand." 275 F.3d 191, 200 (2d Cir. 2001).

### 2. *Frequency of Monitoring of Valves in Gas/Vapor and and Liquid Light Service (Claim 3)*

The Government alleges that Altivia has missed monitoring events for its valves in gas/vapor and liquid light service in 2015 and 2016.  Altivia has two arguments contra.

The first takes aim at pre-ownership liability for the missed monitoring in 2015. (Doc. 7 at PageID# 75).  Altivia bought the Haverhill facility in November 2015. (*Id.*). Thus, unless an annual report was due between November and December 31, 2015, Altivia would have not missed any reports of its monitoring.  Almost as an afterthought, Altivia states: "to the extent that the Complaint may be suggesting that ALTIVIA bears responsibility for missed inspections that preceded ALTIVIA's taking over ownership in 2015, the Complaint provides no basis for concluding that such a claim is plausible." (Doc. 7 at PagID# 76).  It is this last assertion that presents a problem.

This Court is fully willing to hear the argument that Altivia cannot be held responsible for failure-to-monitor liabilities that preceded its ownership.  The problem is Altivia does not make that argument: Altivia only gestures to it.  Initially, the Court notes the complaint *does allege* that "[t]he asset purchase agreement requires ALTIVIA to assume *all liability under assigned permits*, including the then existing Title V permit for the Haverhill Facility." (Doc. 7 at ¶7) (emphasis added).[8]  It remains Altivia's burden to

---

[8]  There is an absence of any discussion, from either side, about the substance of the bankruptcy proceeding that led to Altivia's purchase of the Haverhill Facility or as to the content of the asset purchase agreement.

establish that the Government is not entitled to relief as a matter of law on this claim.  To that end, this Court will not assume Altivia did not inherit liability for missed monitoring without a compelling argument.  And Altivia simply has not provided one.

Second, Altivia argues "the claim does not allege that the valves were actually in service at the time of monitoring." (Doc. 7 at PageID# 76).  This argument never gets off the ground.  The complaint is premised on valves in "liquid light or gas *service*."  The thrust of the complaint leaves the Court with little doubt that the allegations regard allegedly active valves.  This notion is bolstered by the fact that the Government's allegations stem from Altivia's own LDAR.  If that database tracks out-of-service valves, Altivia would be well placed to say so, but it does not.  For now, Altivia's argument is unavailing.

Similarly, the Court is unpersuaded that Altivia is left "in a position where it cannot effectively defend itself because it cannot identify even the barest specifics as to any of the alleged missed events." (Doc. 7 at PageID# 77).  Its database might be a good place to start, since that is the basis for the Government's claims.  The contents of that database are unclear to the Court, to be sure, but it seems fair to ask that Altivia orient itself to the same records on which the complaint is clearly premised.  In any case, the Court cannot accept that the Government must identify valves individually—by whichever unique identifiers valves may have—to plausibly allege that Altivia has failed to live up to its valve-monitoring obligations.  The Court rejects the motion to dismiss as to this claim.

### 3.  *Frequency of Monitoring Connectors (Claim 4)*

The Government's fourth claim pursues missed monitoring of "connectors" in light liquid and gas service.  Altivia's argues that the Government fails to plead the leaky-connector rate and therefore does not establish the applicable reporting period, so it cannot establish a cause of action.  (Doc. 7 at PageID# 77).

The fair inference from the Government's complaints is that it believes reports were due in both 2015 and 2016, suggesting yearly reporting was appropriate. (Doc. 1 at ¶¶ 90-92).  The allegations regarding the Notice of Compliance further support the inference that the connector-leak reports were due on an annual basis. (*Id.* at ¶90).  Contrary to Altivia's claims, the Court does not find that the Government takes the Notice of Compliance as a legal document that sets the applicable reporting period. (*See* Doc. 7 at PageID# 78).  However, that notice may well support the plausibility that the proper reporting period was indeed annual.

Put another way, the Court finds it is proper to infer that Altivia and its predecessor were not opting into annual monitoring when it only had the obligation to do so every four years.  Once again, Altivia is free to demonstrate what its proper reporting period was and when its reports were due.  For now, the Government's asserted facts plausibly give rise to its claim of missed connector monitoring in violation of 40 C.F.R. §63.174(a).

On the connector question, Altivia repurposes several of its arguments from the leaky-valves discussion—such as the argument that it does not inherit its predecessor's

liability for missed monitoring and that the Government does not plead the connectors were "in service."  The Court does not address them again except to say they are unpersuasive here as well.  Therefore, the Court denies Altivia's motion to dismiss this claim.

### 4.   *Emissions from CHP1, CHP2, and Phenol Open Systems (Claim 6)*

In its complaint, the Government alleges Altivia has not controlled emissions from its liquid streams contained at CHP1, CHP2, and Phenol hubs.  (Doc. 1 at PageID# 114). The Government bases this allegation on its instrument readings of emissions and observed visual leaks at "drain hubs, sample lines, and collection vessels." (*Id.* at ¶113). "These observations show that ALTIVIA failed to control emissions from liquid streams in the CHP1, CHP2, and Phenol open systems" in violation of 40 C.F.R. §63.149. (*Id.* at ¶114).

Altivia contends that the allegations are too vague, but its argument is unpersuasive. (Doc. 7 at PageID# 80).  Specifically, Altivia says the problems identified "could refer to a large universe of equipment[.]"  However, it is unclear from Altivia's motion what a more exacting identification would look like or if it is possible.  And it is worth remembering, once again, that "detailed factual allegations" are not here required. *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The complaint plainly describes the problem the Government observed: emissions and leaks at "drain hubs, sample collection vessels, sample lines, trenches, and covers" (Doc. 1 at ¶113).  The Court cannot conclude that this allegation is so vague that Altivia cannot

defend against it.

It is still the Government's burden to prove its case, but its allegations fairly put Altivia on notice that the relevant systems are giving off emissions and not sufficiently controlled for leaks. Accordingly, Altivia's motion to dismiss, as it relates to the Government's sixth claim, fails.

### C. Fair Notice Doctrine (Claim 1 and Claim 5)

The fair notice doctrine embraces a principle that an agency must make its interpretation known before enforcing it. *Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986). Altivia brings a "fair notice" argument to bear on behalf of tank 202-f and the alleged individual drain systems. Altivia specifically contends "that EPA is precluded from assessing a penalty for violations that occurred before EPA had provided fair notice of its NESHAP regulatory interpretation giving rise to the penalty." (Doc. 7 at PageID# 70 (citing *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224–25 (4th Cir. 1997)).

In applying the fair notice doctrine to tank 202-f, Altivia argues:

Vessel 202-F has been at the Haverhill Facility since 1986. In the Permit, 202-F was expressly identified as uncontrolled and not listed among the Group 1 process vents subject to control requirements. Given this history, the government runs afoul of due process in seeking penalties based on an inspection that occurred in 2017 and where ALTIVIA's first notice of the United States' view only came as a result of that inspection and its aftermath. Accordingly, the United States' claims for civil penalties based on these allegations should be dismissed.

(Doc. 7 at PageID# 70). There are two issues with Altivia's argument.

First, the present dispute does not necessarily turn on a "regulatory interpretation."

30

The Government's theory is that the permitting authority possibly did not know tank 202-f emitted HAPs when it issued the permit.  The Government only discovered the HAP emissions upon inspection.  Thus, it seems equally plausible at this point that this enforcement action is based on "new information" rather than a new, and unnoticed, interpretation.

Second, Altivia's argument is underdeveloped in that it does not even identify what regulations and what interpretations it is considering.  It only suggests that its permit regarded tank 202-f as a "surge control vessel."  For that reason, the argument is essentially co-extensive with Altivia's permit shield defense and unpersuasive, at this stage, for the same reasons already addressed.  Altivia adds nothing to its fair notice doctrine defense with regard to the individual drain system.  Thus, Altivia's fair notice argument is not well-taken with regard to either tank 202-f (claim 1) or the individual drain systems (claim 5).

## IV.  CONCLUSION

Accordingly, for the reasons reflected above, Defendant Altivia's motion to dismiss is **DENIED** (Doc. 7).

**IT IS SO ORDERED.**

Date:   2/15/2022

Timothy S. Black
United States District Judge