IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Civil No. 1:21-cv-00640-ALM-KLL |
| | ) |
| v. | ) Hon. Algenon L. Marbley |
| | ) |
| ALTIVIA PETROCHEMICALS, LLC, | ) |
| | ) |
| Defendant. | ) |

**CONSENT DECREE**

# TABLE OF CONTENTS

I. JURISDICTION AND VENUE ................................................................................................ 2
II. APPLICABILITY ................................................................................................................... 2
III. DEFINITIONS ....................................................................................................................... 3
IV. CIVIL PENALTY .................................................................................................................. 8
V. COMPLIANCE REQUIREMENTS ...................................................................................... 9
VI. ADDITIONAL INJUNCTIVE RELIEF ............................................................................. 33
VII. REPORTING REQUIREMENTS ....................................................................................... 38
VIII. INCORPORATION OF CONSENT DECREE REQUIREMENTS INTO FEDERALLY
ENFORCEABLE PERMITS ................................................................................................ 40
IX. STIPULATED PENALTIES ............................................................................................... 41
X. FORCE MAJEURE ............................................................................................................. 51
XI. DISPUTE RESOLUTION .................................................................................................. 53
XII. INFORMATION COLLECTION AND RETENTION ....................................................... 56
XIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............................................ 58
XIV. COSTS ................................................................................................................................ 59
XV. NOTICES ............................................................................................................................ 59
XVI. EFFECTIVE DATE ............................................................................................................ 61
XVII. RETENTION OF JURISDICTION .................................................................................... 61
XVIII. MODIFICATION ............................................................................................................... 61
XIX. TERMINATION ................................................................................................................. 61
XX. PUBLIC PARTICIPATION ............................................................................................... 62
XXI. SIGNATORIES/SERVICE ................................................................................................ 63
XXII. INTEGRATION .................................................................................................................. 63
XXIII. 26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION .............................................. 63
XXIV. FINAL JUDGMENT .......................................................................................................... 64
XXV. APPENDICES .................................................................................................................... 64

WHEREAS, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint against Defendant, Altivia Petrochemicals, LLC ("Altivia" or "Defendant") in this action;

WHEREAS, Altivia owns and operates a chemical manufacturing plant located at 1019 Haverhill-Ohio Furnace Road, Haverhill, Ohio ("Facility");

WHEREAS, the Complaint alleges that Altivia, violated Section 113(a) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(a), and the implementing regulations at: (1) 40 C.F.R. Part 70, Title V Permit Program; (2) 40 C.F.R. Part 63, Subpart F (National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry); (3) 40 C.F.R. Part 63, Subpart G (National Emission Standards for Organic Hazardous Air Pollutants From the Synthetic Organic Chemical Manufacturing Industry); and (4) 40 C.F.R. Part 63, Subpart H (National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks);

WHEREAS, Defendant does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint;

WHEREAS, the United States and the Defendant (the "Parties") recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

# I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and CAA Section 113(b), 42 U.S.C. § 7413(b), and over the Parties. Venue lies in this District pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because Altivia resides and is located in this judicial district and the violations alleged in the Complaint are alleged to have occurred in, and Altivia conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree and any such action and over Defendant, and consents to venue in this judicial district.

2.    For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b).

# II.    APPLICABILITY

3.    The obligations of this Consent Decree apply to and are binding upon the United States and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4.    No transfer of ownership or operation of the Facility, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented. At least 30 Days prior to such transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA Region V, the United States Attorney for the Southern District of Ohio, and the United States Department of Justice, in accordance with Section XV (Notices). Any attempt

to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

5.      Defendant shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendant shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6.      In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III.     DEFINITIONS

7.      Terms used in this Consent decree that are defined in the CAA or in regulations promulgated pursuant to the CAA shall have the meanings assigned to them in the CAA or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

"Annual" or "annually" means a calendar year, except as otherwise provided in applicable LDAR provisions;

"Average" means the arithmetic mean;

"CAP" means the Corrective Action Plan described in Paragraph 48 of this Consent Decree;

"Collaterally Impacted Infrastructure" means each junction box, trench, pipe chase, pipe chase cover, and any other equipment used to convey stormwater, process wastewater, or non-Group 1 wastewater at each Covered Process Unit to a waste management unit.

"Complaint" means the complaint filed by the United States in this action;

"Consent Decree" or "Decree" means this Decree and all appendices attached hereto, but in the event of any conflict between the text of this Consent Decree and any Appendix, the text of this Consent Decree shall control;

"Cover" means each tightly fitting solid cover (TFSC) and any other equipment described in Table 35 of Subpart G as being subject to control requirements and used to control emissions from liquid streams in open systems at each Covered Process Unit.

"Covered Equipment" means all Covered Types of Equipment in all Covered Process Units;

"Covered Process Unit" means the Phenol units at the Facility, each of which comprises a "chemical manufacturing process unit" (as defined in 40 C.F.R. § 63.101) that is subject to 40 C.F.R. 63, Subparts F, G, and H;

"Covered Types of Equipment" means all valves, connectors, pumps, agitators, and OELs in light liquid or gas/vapor service that are regulated under any "equipment leak" provisions of 40 C.F.R. Part 61 or 63 or a state or local LDAR Program;

"Day" means a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

"Defendant" means ALTIVIA Petrochemicals, LLC;

"DOR" means Delay of Repair;

"Effective Date" shall have the definition provided in Section XVI;

"EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies;

"Facility" means Defendant's chemical manufacturing plant located in Haverhill, Ohio;

"LDAR" or "Leak Detection and Repair" means the leak detection and repair activities required by any "equipment leak" provisions of 40 C.F.R. Part 61 or 63. LDAR also means any state or local equipment leak provisions that: (a) require the use of Method 21 to monitor for equipment leaks and also require the repair of leaks discovered through such monitoring; and (b) are intended to minimize emissions of hazardous air pollutants;

"LDAR Audit Commencement Date" or "Commencement of an LDAR Audit" means the first day of the on-site inspection that accompanies an LDAR audit;

"LDAR Audit Completion Date" or "Completion of an LDAR Audit" means 120 days after the LDAR Audit Commencement Date;

"LDAR Personnel" means all Defendant's contractors and employees who perform LDAR monitoring, LDAR data input, maintenance of LDAR monitoring devices, leak repairs on equipment subject to LDAR, and/or any other field duties generated by LDAR requirements. The term "LDAR Personnel" does not include a contractor that performs repair or maintenance activities on LDAR equipment or LDAR monitoring devices at its off-site facility, such as an off-site valve shop or monitoring device repair shop;

"LDAR Program" means the Leak Detection and Repair Program specified in Paragraphs 11-50 of this Decree required to come into compliance with 40 C.F.R. Part 63, Subpart H and any applicable state or local equipment leak requirements, and required measures to mitigate the environmental harm caused by alleged non-compliance at the Covered Process Units and Covered Equipment (including "drill and tap" requirements in Paragraph 22, the

"valve replacement and improvement" requirements in Paragraphs 26-33, and "the connector replacement and improvement" requirements in Paragraphs 34-36);

"Low-Emissions Packing" or "Low-E Packing" means either of the following:

(i)     A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the product; provided, however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

(ii)    A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm;

"Low-Emissions Valve" or "Low-E Valve" means either of the following:

(i)     A valve (including its specific packing assembly or stem sealing component) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does so emit at any time in the first five years, the manufacturer will replace the valve; provided, however, that no valve shall qualify as "Low-E" by reason of written warranty unless the valve (including its specific packing assembly) either:

*(a)*    first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

*(b)*    is as an "extension" of another valve that qualified as "Low-E" under Subparagraph (i)*(a)* above;

or

(ii)    A valve (including its specific packing assembly) that:

*(a)*    has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for

testing fugitive emissions and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm; or

    *(b)*    is an "extension" of another valve that qualified as "Low-E" under Subparagraph (ii)*(a)* above.

For purposes of Subparagraphs (i)*(b)* and (ii)*(b)*, being an "extension of another valve" means that the characteristics of the valve that affect sealing performance (*e.g.,* type of valve, stem motion, tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and construction) are the same or essentially equivalent as between the tested and the untested valve;

"Maintenance Shutdown" means a shutdown of a Covered Process Unit that either is done for the purpose of scheduled maintenance or lasts longer than fourteen calendar days;

"Method 21" means the test method found at 40 C.F.R. Part 60, Appendix A, Method 21. To the extent that the Covered Equipment is subject to regulations that modify Method 21, those modifications shall be applicable;

"OEL" or "Open-Ended Line" means any line serviced by a valve, except pressure relief valves, having one side of the valve seat in contact with process fluid and one side open to atmosphere, either directly or through open piping;

"OELCD" means an open-ended valve or line at the closure device;

"Paragraph" means a portion of this Decree identified by an Arabic numeral;

"Parties" means the United States and Defendant;

"Quarter" or "quarterly" means a calendar quarter (January through March, April through June, July through September, October through December) except as otherwise provided in applicable LDAR provisions;

"Repair Verification Monitoring" means the utilization of monitoring (or other method that indicates the relative size of the leak) within 24 hours after each attempt at repair of a leaking piece of equipment in order to determine whether the leak has been eliminated or is below the applicable leak definition in this LDAR Program;

"Screening Value" means the highest emission level that is recorded at each piece of equipment as it is monitored in compliance with Method 21;

"Section" means a portion of this Decree identified by a Roman numeral;

"United States" means the United States of America, acting on behalf of EPA;

"Week" or "weekly" means the standard calendar period, except as otherwise provided in applicable LDAR provisions.

## IV.    CIVIL PENALTY

8.    Within 30 Days after the Effective Date, Defendant shall pay the sum of $1,112,500 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging.

9.    Defendant shall pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of Ohio after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Timothy Albert, V.P. Manufacturing ALTIVIA
ALTIVIA Petrochemicals, LLC
1019 Haverhill Ohio Furnace Road
Haverhill, OH 45636

on behalf of Defendant. Defendant may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States and EPA in accordance with Section XV (Notices).

At the time of payment, Defendant shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to the United States via email or regular mail in accordance with Section XV. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Altivia Petrochemicals, LLC* and shall reference the civil action number, CDCS Number and DOJ case number 90-5-2-1-11905.

10.     Defendant shall not deduct any penalties paid under this Decree pursuant to this Section or Section IX (Stipulated Penalties) in calculating its federal income tax.

V.     COMPLIANCE REQUIREMENTS

**Subsection A: Applicability of the LDAR Program**

11.     The requirements of this LDAR Program shall apply to all Covered Equipment. The requirements of Subsections B and L shall apply to all equipment at the Facility that is regulated under LDAR. The requirements of this LDAR Program are in addition to, and not in lieu of, the requirements of any other LDAR regulation that may be applicable to a piece of Covered Equipment. If there is a conflict between an LDAR regulation and this LDAR Program, Defendant shall follow the more stringent of the requirements.

**Subsection B: Facility-Wide LDAR Document**

12.     By no later than six months after the date of lodging of this Consent Decree, Defendant shall develop a facility-wide document for the Facility that describes: (i) the facility-wide LDAR Program (*e.g.*, applicability of regulations to process units and/or specific equipment; leak definitions; monitoring frequencies); (ii) a tracking program (*e.g.*, Management of Change) that ensures that new pieces of equipment added to the Facility for any reason are integrated into the LDAR Program and that pieces of equipment that are taken out of service are removed from the LDAR Program; (iii) the roles and responsibilities of all employee and contractor personnel assigned to LDAR functions at the Facility; (iv) how the number of personnel dedicated to LDAR functions is sufficient to satisfy the requirements of the LDAR Program; and (v) how the Facility plans to implement this LDAR PROGRAM. Beginning in 2023, Defendant shall review this document on an annual basis and update it as needed by no later than December 31 of each year.

**Subsection C: Monitoring Frequency and Equipment**

13.     Beginning no later than nine months after the date of lodging, for all Covered Equipment, Defendant shall comply with the following periodic monitoring frequencies, unless: (i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the relevant Covered Process Unit has been permanently shut down:

    a.     Valves - Quarterly

    b.     Connectors - Semi-Annually

    c.     Pumps/Agitators - Monthly, except that monitoring shall not be required for pumps and agitators that are seal-less or that are equipped with a dual mechanical seal system that complies with the requirements of 40 C.F.R. 63.163(e).

d.      Open-Ended Lines - Quarterly (monitoring will be done at the closure device; if the closure device is a valve, monitoring will be done in the same manner as any other valve, but also shall include monitoring at the end of the valve or line that is open to the atmosphere), except those open-ended lines that meet the criteria of 40 C.F.R. 63.167(e).

Compliance with the monitoring frequencies in this Paragraph 13 is not required when a specific, applicable LDAR provision excludes or exempts, fully or partially, monitoring at a periodic frequency (*e.g.,* an exemption for equipment that is designated as unsafe-to-monitor or difficult-to-monitor or an exemption for pumps that have no externally actuated shaft), provided that Defendant satisfies all applicable conditions and requirements for the exclusion or exemption set forth in the regulation.

14.      Valves and Connectors that Have Been Replaced, Repacked, or Improved Pursuant to Subsection G. For valves and connectors that have been replaced, repacked, or improved pursuant to Subsection G (Valve and Connector Replacement and Improvement Program), Defendant may elect to monitor any and all such equipment at the most stringent monitoring frequency required by any LDAR regulation that applies to the piece of equipment, rather than the frequency specified in Paragraph 13 above. If any such piece of equipment is found to be leaking, Defendant shall monitor that piece of equipment monthly until the piece of equipment shows no leaks at the leak definition levels in Table 1 of Subsection D for six consecutive months. At that time, Defendant may commence monitoring at the frequency for that type of equipment set forth in Paragraph 13.

15.      a.      Beginning no later than nine months after the date of lodging, for all Covered Equipment, Defendant shall comply with Method 21 in performing LDAR monitoring,

using an instrument attached to a data logger (or an equivalent instrument) which directly electronically records the Screening Value detected at each piece of equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and technician. Defendant shall transfer this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

b.  If, during monitoring in the field, a piece of Covered Equipment is discovered that is not listed in the data logger, Defendant is permitted to monitor the piece of Covered Equipment and record, by any means available, the Screening Value, the date and time of the Screening Value, and the identification numbers of the monitoring instrument and technician. In such an instance, the failure to initially record the information electronically in the data logger does not constitute a violation of this Paragraph's requirement to record the required information electronically, provided that Defendant thereafter promptly adds the piece of Covered Equipment and the information regarding the monitoring event to the LDAR database.

**Subsection D: Leak Detection and Repair Action Levels**

16.  a.  Beginning no later than nine months after the date of lodging of this Consent Decree and continuing until termination, for all leaks from Covered Equipment detected at or above the leak definitions listed in Table 1 for the specific equipment type, Defendant shall perform repairs in accordance with Paragraphs 18 - 23.

Table 1: Leak Definitions by Equipment Type

| Equipment Type | Lower Leak Definition (ppm) |
|---|---|
| Valves | 375 |
| Connectors | 375 |
| Pumps | 1000 |
| Agitators | 1000 |
| OELs (at the Closure Device) | 375 |

b.      For purposes of these lower leak definitions, Defendant may elect to adjust or not to adjust the monitoring instrument readings for background pursuant to any provisions of applicable LDAR requirements that address background adjustment, provided that Defendant complies with the requirements for doing so or not doing so.

17.      Beginning no later than nine months after the date of lodging of this Consent Decree, for all Covered Equipment, at any time, including outside of periodic monitoring, that Defendant detects a potential leak through audio, visual, or olfactory sensing, or is informed of a potential leak, Defendant shall repair the piece of Covered Equipment in accordance with all applicable regulations and, if repair is required, with Paragraphs 18-23. Beginning no later than nine months after the date of lodging of this Consent Decree, for all valves, pumps, agitators, and OELs in heavy liquid service, at any time that evidence of a potential leak is detected through audio, visual, or olfactory senses, Defendant shall repair the piece of equipment.

**Subsection E: Repairs**

18.      Except as explicitly provided in Subparagraphs 30.d.i and 36.c.i, by no later than five days after detecting a leak, Defendant shall perform a first attempt at repair or remove the Covered Equipment from service for repair. By no later than 15 days after detection, unless the Covered Equipment has been removed from service, Defendant shall perform a final attempt at repair of the leaking piece of Covered Equipment or may place the piece of Covered Equipment on the Delay of Repair list provided that Defendant has complied with all applicable regulations and with the requirements of Paragraphs 19-23 and 25.

19.      Beginning no later than six months after the date of lodging of this Consent Decree, Defendant shall be subject to the requirements of Paragraphs 19-24 of this Decree.

Except as explicitly provided in Subparagraphs 30.d.i and 36.c.i, Defendant shall perform Repair Verification Monitoring during all repair attempts.

20.    <u>Repair Attempt for Valves (other than Control Valves or the second valve on an OEL) with Screening Values greater than or equal to 200 and less than 375 ppm</u>. For any valve, excluding control valves or the second valve on an OEL, that has a Screening Value greater than or equal to 200 and less than 375 ppm, Defendant shall make an initial attempt to repair the valve and eliminate the leak by no later than five days after detecting the leak. Repair Verification Monitoring shall be performed to determine if the repair has been successful. If, upon Repair Verification Monitoring, the Screening Value is less than 375 ppm, no further actions shall be required. If, upon Repair Verification Monitoring, the Screening Value is greater than or equal to 375 ppm, Defendant shall undertake the requirements for repair required by this Consent Decree but Defendant shall not be required to replace or repack the valve pursuant to Subsection G.

21.    For valves (other than Control Valves) that serve as the last valve in an OEL and has a Screening Value greater than or equal to 200 and less than 375 ppm, Defendant shall make an initial attempt to repair the valve or remove the equipment from service for repair by no later than five days after detecting the leak. By no later than 15 days after detection of the leak, Defendant shall make a final attempt at repair, except for equipment removed from service for repair, by flushing the seat of the valve and open end of the valve/pipe exposed to the atmosphere to remove any residues contributing to emissions. If the repair attempts reduce emission levels below 375 ppm, the component will not be deemed to be leaking and no report is required. If the repair attempts do not result in a screening value of less than 375 ppm, the valve will be scheduled for replacement as per the Valve Improvement Program requirements set out at Paragraphs 28-31. If process shutdown is required to replace such a valve, a second valve may be

installed until the repair can be implemented, subject to all applicable provisions for new connectors and or valves. For safety reasons, capping will not be utilized for OELs in Cumene Hydroperoxide service.

22.    Drill and Tap for Valves (other than Control Valves).

a.    Except as provided in Subparagraph 22.b, for leaking valves (other than control valves), when other repair attempts have failed to reduce emissions below the applicable leak definition and Defendant is not able to remove the leaking valve from service, Defendant shall attempt at least one drill-and-tap repair (with a second injection of sealant if the first injection is unsuccessful at repairing the leak) before placing the valve (other than provisionally, as set forth in Subparagraph 22.c) on the DOR list.

b.    Drill-and-tap is not required: (i) when Subparagraph 30.d.i applies; or (ii) when there is a major safety, mechanical, product quality, or environmental issue with repairing the valve using the drill-and-tap method, in which case, Defendant shall document the reason(s) why any drill-and-tap attempt was not performed prior to placing any valve on the DOR list.

c.    If a drill-and-tap attempt can reasonably be completed within the 15-day repair period, Defendant shall complete the drill-and-tap attempt in that time period. If a drill-and-tap attempt cannot reasonably occur within the 15-day repair period (*e.g.*, if Defendant's drill-and-tap contractor is not local and must mobilize to the Facility), Defendant provisionally may place the valve on the DOR list pending attempting the drill-and-tap repair as expeditiously as practical. In no event may Defendant take more than 30 days from the initial monitoring to attempt a drill-and-tap repair. If drill-and-tap is successful, the valve shall be removed from the provisional DOR list.

23.     Except as explicitly provided in Subparagraphs 30.d.i and 36.c.i, for each leak, Defendant shall record the following information: the date of all repair attempts; the repair methods used during each repair attempt; the date, time and Screening Values for all re-monitoring events; and, if applicable, the information required under Paragraphs 21 and 25 for Covered Equipment placed on the DOR list.

24.     Nothing in Paragraphs 19-23 is intended to prevent Defendant from taking a leaking piece of Covered Equipment out of service in order to repair it; provided, however, that Defendant must perform Repair Verification Monitoring on such piece of Covered Equipment within 24-hours after placing it back in service.

**Subsection F: Delay of Repair**

25.     Beginning no later than three months after the date of lodging of this Consent Decree, for all Covered Equipment that remains in organic hazardous air pollutant service and is placed on the DOR list, Defendant shall:

a.     Require sign-off from the relevant area operations leader or person of similar authority that: (i) the piece of Covered Equipment is technically infeasible to repair without a process unit shutdown; or (ii) emissions of purged material resulting from immediate repair would be greater than the fugitive emissions likely to result from DOR. Signoff shall not be required for pumps placed on DOR for the reasons set forth in 40 C.F.R. § 63.171(d).

b.     Undertake periodic monitoring, at the frequency required for other pieces of Covered Equipment of that type in the process unit, of the Covered Equipment placed on the DOR list; and

c.     (i) Repair the piece of Covered Equipment to a screening value that is less than the applicable leak definitions set forth in Table 1 of Subsection D within the time frame

required by the applicable LDAR regulation; or, (ii) if applicable under Subsection G, replace, repack, or improve the piece of Covered Equipment by the end of the next process unit shutdown.

**Subsection G: Valve and Connector Replacement and Improvement Program**

26. Commencing no later than nine months after the date of lodging of this Consent Decree, and continuing until termination, Defendant shall implement the program set forth in Paragraphs 27-38 to improve the emissions performance of the valves (excluding pressure relief valves) and connectors that are Covered Equipment in each Covered Process Unit.

27. <u>Work Practices relating to Any Valve that is Installed, Replaced, or Repacked</u>. Defendant shall undertake the following work practices with respect to any valve that they install, replace, or repack:

      a. Upon installation or re-installation (in the case of repacking), Defendant shall, when applicable for the valve design, tighten the valve's packing gland nuts or their equivalent (*e.g.*, pushers) to the manufacturer's recommended gland nut or packing torque.

      b. Not less than three days nor more than two weeks after the valve first is exposed to process fluids at operating conditions, Defendant shall, when applicable for the valve design, recheck the load on the valve packing and, if necessary, shall tighten the packing gland nuts or their equivalent (*e.g.*, pushers) to: (i) the manufacturer's recommended gland nut or packing torque; or (ii) any appropriate tightness that will minimize the potential for fugitive emission leaks of any magnitude.

28. <u>Installing New Valves</u>. Except as provided in Subparagraphs 28.a, 28.b, or Paragraph 32, Defendant shall ensure that each new valve (other than a valve that serves as the closure device on an open-ended line or a secondary valve that is not in constant direct contact

with process fluids) that it installs in each Covered Process Unit, and that, when installed, will be regulated under LDAR, either is a Low-E Valve or is fitted with Low-E Packing. This requirement applies to entirely new valves that are added to a Covered Process Unit and to Existing Valves that are replaced for whatever reason in a Covered Process Unit.

      a. Paragraph 28 shall not apply in emergencies or exigent circumstances requiring immediate installation or replacement of a valve where a Low-E Valve or Low-E Packing is not available on a timely basis. Any such instance shall be reported in the next LDAR Program compliance status report.

      b. Paragraph 28 shall not apply to valves that are installed temporarily for a short-term purpose and then removed (*e.g.*, valves connecting a portion of the Covered Process Unit to a testing device).

      c. Paragraph 28 shall not apply to an Existing Valve that is removed in order to provide access to allow maintenance or other work to be conducted, and is then re-installed.

29. <u>List of all Valves in the Covered Process Units</u>. In the first compliance status report required by Paragraph 56, Defendant shall include a list of tag numbers of all valves subject to this LDAR Program, broken down by Covered Process Unit, that are in existence as of the date of lodging. The valves on this list shall be the "Existing Valves" for purposes of Paragraphs 28 and 30.

30. <u>Replacing or Repacking Existing Valves that have Screening Values at or above 375 ppm with Low-E Valves or Low-E Packing</u>.

      a. <u>Existing Valves Required to be Replaced or Repacked</u>. Except as provided in Paragraph 31 and subject to Paragraph 30, for each Existing Valve that has a Screening Value

at or above 375 ppm during any monitoring event, Defendant shall replace or repack the Existing Valve with a Low-E Valve or with Low-E Packing.

b.      Timing: When Replacing or Repacking does not Require a Process Unit Shutdown. If replacing or repacking does not require a process unit shutdown, Defendant shall replace or repack the Existing Valve by no later than 30 days after the monitoring event that triggers the replacing or repacking requirement, unless Defendant complies with the following:

i.      Prior to the deadline, Defendant must take all reasonable steps to obtain the required valve or valve packing, including all necessary associated materials, as expeditiously as practical, and retain documentation of the actions taken and the date of each such action;

ii.      If, despite Defendant's efforts to comply with Subparagraph 30.b.i, the required valve or valve packing, including all necessary associated materials, is not available in time to complete the installation within 30 days, Defendant must take all reasonable actions to minimize emissions from the valve pending completion of the required replacing or repacking. Examples include:

(*a*)      Repair or repair attempts;

(*b*)      More frequent monitoring, with additional repairs or repair attempts as needed; or

(*c*)      Where practical, interim replacing or repacking of a valve with a valve that is not a Low-E Valve or with packing or sealing components that are not Low-E Packing; and

iii.     Defendant must promptly perform the required replacing or repacking after Defendant's receipt of the valve or valve packing, including all necessary associated materials.

c.     <u>Timing: When Replacing or Repacking Requires a Process Unit Shutdown</u>. If replacing or repacking requires a process unit shutdown, Defendant shall replace or repack the Existing Valve during the first Maintenance Shutdown that follows the monitoring event that triggers the requirement to replace or repack the valve, unless Defendant documents that insufficient time existed between the monitoring event and that Maintenance Shutdown to enable Defendant to purchase and install the required valve or valve packing technology. In that case, Defendant shall undertake the replacing or repacking at the next Maintenance Shutdown that follows thereafter.

d.     <u>Repair Requirements Pending Replacements or Repackings pursuant to Subparagraph 30.a - c</u>.

i.     <u>Subsection E (Repairs) Requirements</u>. For each Existing Valve that has a Screening Value at or above 375 ppm, Defendant shall not be required to comply with Subsection E (Repair) pending replacement or repacking pursuant to Subparagraphs 30.a - c if Defendant completes the replacement or repacking by the date that is no more than 30 days after detecting the leak. If Defendant does not complete the replacement or repacking within 30 days, or if Defendant reasonably can anticipate that it might not be able to complete the replacement or repacking within 30 days, Defendant shall comply with all applicable requirements of Subsection E (Repair).

ii.     <u>Requirements of Applicable Regulations</u>. For each Existing Valve that has a Screening Value at or above 500 ppm, Defendant shall comply with all repair

and "delay of repair" requirements of any applicable regulation pending replacement or

repacking pursuant to Subparagraphs 30.a - c.

31.    Provisions related to Low-E Valves and Low-E Packing.

a.    "Low-E" status not affected by subsequent leaks. If, during monitoring after

installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above

375 ppm, the leak is not a violation of this Decree, does not invalidate the "Low-E" status or use

of that type of valve or packing technology, and does not require replacing other, non-leaking

valves or packing technology of the same type.

b.    Response to certain Screening Values. If, during monitoring after

installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above

375 ppm, all LDAR Program provisions dealing with responses to the Screening Value, such as

repair, delay of repair, and replacement, shall apply according to their terms, except as provided

in Subparagraph 31.c.

c.    Replacing or repacking. The first time a Low-E Valve or a valve that

utilizes Low-E Packing has a Screening Value at or above 375 ppm, Defendant shall not be

required to replace or repack it if Defendant timely repairs the valve and reduces the Screening

Value to below 250 ppm. If the Low-E Valve or a valve that utilizes Low-E Packing

subsequently has a Screening Value at or above 250 ppm, Defendant shall replace or repack it

pursuant to the requirements of Paragraph 30.

32.    Commercial Unavailability of a Low-E Valve or Low-E Packing. Defendant shall

not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a

Low-E Valve or Low-E Packing is commercially unavailable. The factors relevant to the

question of commercial unavailability and the procedures that Defendant must follow to assert that a Low-E Valve or Low-E Packing is commercially unavailable are set forth in Appendix A.

33. <u>Records of Low-E Valves and Low-E Packing</u>. Prior to installing any Low-E Valves or Low-E Packing, or if not possible before installation, then as soon as practicable after installation, Defendant shall secure from each manufacturer documentation that demonstrates that the proposed valve or packing technology meets the definition of "Low-E Valve" and/or "Low-E Packing." Defendant shall retain that documentation for the duration of this Consent Decree and make it available upon request.

34. <u>Connector Replacement and Improvement Descriptions.</u>

a. For purposes of Paragraphs 35 - 36, for each of the following types of existing connectors (*i.e.,* a connector in use at a Covered Process Unit on the date of lodging), the following type of replacement or improvement shall apply:

| Connector Type | Replacement or Improvement Description |
|---|---|
| Flanged | Replacement or improvement of the gasket |
| Threaded | Replacement of the connector with a like-kind connector or other |
| Compression | Replacement of the connector with a like-kind connector or other |
| CamLock | Replacement or improvement of the gasket or replacement or improvement of the CamLock |
| Quick Connect | Replacement or improvement of the gasket, if applicable, or replacement of the connector (with either a like-kind connector or other), if there is no gasket |
| Any type | Elimination (*e.g.,* through welding, pipe (including any of the above) replacement, etc.) |

For purposes of this Paragraph 34, "gasket" means a sealing element that includes, but is not limited to, an O-ring, gasket, or D-ring.

b.      In cases where a like-kind replacement is utilized as the method for replacing or improving an existing connector (*e.g.*, a Quick Connect replaces another Quick Connect), the provisions of Subparagraphs 34.b.i and 34.b.ii shall apply.

(i.)      If there are types, models or styles of a like-kind connector that are less likely to leak than the existing connector, and one or more of those types, models or styles are technically feasible to use (considering the service, operating conditions, and type of piping or tubing that the connector is in) and would not create a major safety, mechanical, product quality, regulatory or other issue, Defendant shall select a like-kind connector from among such types, models or styles.

(ii.)      If Subparagraph 34.b.i does not apply, Defendant may install a like-kind connector that is the same type, model or style as the existing connector.

35.      <u>Installing New Connectors</u>. For each Covered Process Unit, Defendant shall use best efforts, when selecting a new connector that, when installed, will be regulated under LDAR, to select a connector that is least likely to leak, using good engineering judgment, for the service, operating conditions, and type of piping or tubing that the connector is in. This requirement applies to entirely new connectors added to a Covered Process Unit and to connectors that replace existing connectors for whatever reason within a Covered Process Unit.

a.      Paragraph 35 shall not apply in emergencies or exigent circumstances requiring immediate installation or replacement of a connector where the required type of connector is not available on a timely basis. Any such instance shall be reported in the next LDAR Program compliance status report.

b.    Paragraph 35 shall not apply to a connector that is installed temporarily for a short-term purpose and then removed (*e.g.*, a connector connecting a portion of the Covered Process Unit to a testing device).

c.    Paragraph 35 shall not apply to an existing connector that is removed in order to provide access to allow maintenance or other work to be conducted, and is then re-installed.

36.    <u>Replacing or Improving Connectors</u>.

a.    <u>Trigger for Replacement or Improvement Requirements</u>. For each connector that, in any two of four consecutive monitoring periods, has a Screening Value at or above 375 ppm, Defendant shall replace or improve the connector in accordance with the applicable replacement or improvement described in Paragraph 36. Defendant shall use best efforts to install a replacement or improvement that will be the least likely to leak, using good engineering judgment, for the service, operating conditions, and type of piping or tubing that the connector is in.

b.    <u>Timing</u>. If the replacement or improvement does not require a process unit shutdown, Defendant shall undertake the replacement or improvement within 30 days after the monitoring event that triggers the replacement or improvement requirement. If the replacement or improvement requires a process unit shutdown, Defendant shall undertake the replacement or improvement during the first Maintenance Shutdown that follows the monitoring event that triggers the requirement to replace or improve the connector, unless Defendant documents that insufficient time existed between the monitoring event and the Maintenance Shutdown to enable Defendant to secure and install the replacement or improvement. In that case, Defendant shall

undertake the replacement or improvement at the next Maintenance Shutdown that follows thereafter.

      c.     Repair Requirements Pending Replacements or Improvements Pursuant to Subparagraph 36.a.

      (i.)     Subsection E (Repairs) Requirements. For each connector that has a Screening Value at or above 375 ppm, Defendant shall not be required to comply with Subsection E (Repairs) pending replacement or improvement pursuant to Subparagraph 36.a if Defendant completes the replacement or improvement within 30 days of detecting the leak. If Defendant does not complete the replacement or improvement within 30 days, or if Defendant reasonably can anticipate that it might not be able to complete the replacement or improvement within 30 days, Defendant shall comply with all applicable requirements of Subsection E (Repairs).

      (ii.)     Requirements of Applicable Regulations. For each connector that has a Screening Value at or above 500 ppm, Defendant shall comply with all repair and "delay of repair" requirements of any applicable regulation pending replacement or improvement pursuant to Subparagraph 36.a.

37.     Nothing in Paragraphs 29-38 requires Defendant to utilize any valve, valve packing technology, or connector that is not appropriate for its intended use in a Covered Process Unit.

38.     In each Compliance Status Report due under Section VII (Reporting) of this Decree, Defendant shall include a separate section in the Report that: (i) describes the actions they took to comply with this Subsection G, including identifying each piece of equipment that triggered a requirement in Subsection G, the Screening Value for that piece of equipment, the

type of action taken (*i.e.*, replacement, repacking, or improvement, and the date when the action was taken); (ii) identifies any required actions that were not taken and explains why; and (iii) identifies the schedule for any known, future replacements, repackings, or improvements.

**Subsection H: Management of Change**

39.     <u>Management of Change</u>. To the extent not already done, beginning no later than six months after the date of lodging of this Consent Decree, Defendant shall ensure that each valve, connector, pump, agitator, and OEL added to the Covered Process Units at the Covered Facilities for any reason is evaluated to determine if it is subject to LDAR requirements. Defendant also shall ensure that each valve, connector, pump, agitator, and OEL that was subject to the LDAR Program is eliminated from the LDAR Program if it is physically removed from a Covered Process Unit. This evaluation shall be a part of Defendant's facility-wide Management of Change protocol.

**Subsection I: Training**

40.     By no later than one year after the date of lodging of this Consent Decree, Defendant shall have ensured that all LDAR Personnel have completed training on all aspects of LDAR, including this LDAR Program, that are relevant to the person's duties. By that same time, Defendant shall develop a training protocol (or, as applicable, require their contractor to develop a training protocol for the contractor's employees) to ensure that refresher training is performed once per calendar year beginning, with respect to each employee or contractor, in the first full year after completion of initial training. Defendant also shall ensure (or as applicable, require their contractor to ensure for the contractor's employees) that new LDAR Personnel are

sufficiently trained prior to any field involvement (other than supervised involvement for purposes of training) in the LDAR Program.

**Subsection J: Quality Assurance ("QA")/Quality Control ("QC")**

41. <u>Daily Certification by Monitoring Technicians</u>. Commencing by no later than three months after the date of lodging of this Consent Decree, on each day that monitoring occurs, at the end of such monitoring, Defendant shall ensure that each monitoring technician certifies that the data collected accurately represents the monitoring performed for that day by requiring the monitoring technician to sign a form that includes the following certification:

> On [insert date], I reviewed the monitoring data that I collected today and to the best of my knowledge and belief, the data accurately represents the monitoring that I performed today.

42. Commencing by no later than the first full calendar quarter after the date of lodging of this Consent Decree, at times that are not announced to the LDAR monitoring technicians, an LDAR-trained employee or contractor of Defendant, who does not serve on a routine basis as an LDAR monitoring technician at the Facility, shall undertake the following no less than once per calendar quarter:

a. Determine whether the equipment was monitored at the appropriate frequency;

b. Determine whether the proper documentation and sign-offs have been recorded for all equipment placed on the DOR list;

c. Determine whether the repairs have been performed in the required periods;

d. Review monitoring data and equipment counts (*e.g.,* number of pieces of equipment monitored per day) for feasibility and unusual trends;

     e.    Determine whether proper calibration records and monitoring instrument maintenance information are maintained;

     f.    Determine whether other LDAR Program records are maintained as required; and

     g.    Observe in the field each LDAR monitoring technician who is conducting leak detection monitoring to ensure monitoring during the quarterly QA/QC is being conducted as required.

Defendant promptly shall correct any deficiencies detected or observed. Defendant shall maintain a log that: (i) records the date and time that the reviews, verifications, and observations required by this Paragraph were undertaken; and (ii) describes the nature and timing of any corrective actions taken.

**Subsection K: LDAR Audits and Corrective Action**

43.    Defendant shall retain a third party with experience in conducting LDAR audits to conduct an LDAR audit at each Covered Process Unit pursuant to the schedule in Paragraph 44 and the requirements of Paragraphs 45 and 46. Defendant shall select a different company than its regular LDAR contractor to perform the third-party audit.

44.    <u>Audit Schedule</u>. Until termination of this Decree, Defendant shall ensure that an LDAR audit is conducted in accordance with the following schedule: for the first LDAR audit, the LDAR Audit Commencement Date shall be no later than six months after the date of lodging of this Consent Decree; for the second LDAR audit, the LDAR Audit Completion Date shall occur during the third year after the date of lodging, within the same calendar quarter that the first LDAR Audit Completion Date occurred; and for the final LDAR audit, the LDAR Audit

Completion Date shall occur during the fifth year after the date of lodging, within the same calendar quarter that the prior LDAR Audit Completion Dates occurred.

45.     For each Covered Process Unit, each LDAR audit shall consist of: (i) reviewing compliance with all applicable LDAR regulations, including LDAR requirements related to valves, connectors, pumps, agitators, and OELs in heavy liquid service; (ii) reviewing and/or verifying the same items that are required to be reviewed and/or verified in Subparagraphs 42.a - 42.f; (iii) reviewing whether any pieces of equipment that are required to be in the LDAR Program are not included; and (iv) "comparative monitoring" as described in Paragraph 46. With respect to items (i), (iii), and (iv), Defendant shall comply with generally accepted LDAR audit practices. LDAR audits after the first audit also shall include reviewing the Covered Process Unit's compliance with this LDAR Program.

46.     <u>Comparative Monitoring.</u> Comparative monitoring during LDAR audits shall be undertaken as follows:

a.     <u>Calculating a Comparative Monitoring Audit Leak Percentage</u>. Covered Equipment shall be monitored in order to calculate a leak percentage for each Covered Process Unit, broken down by equipment type (*i.e.,* valves, pumps, agitators, connectors, and OELCDs). For descriptive purposes under this Section, the monitoring that takes place during the audit shall be called "comparative monitoring" and the leak percentages derived from the comparative monitoring shall be called the "Comparative Monitoring Audit Leak Percentages." In undertaking Comparative Monitoring, Defendant shall not be required to monitor every component in each Covered Process Unit, but shall comply with generally accepted LDAR audit practices in determining the number of components to monitor.

b.    Calculating the Historic, Average Leak Percentage from Prior Periodic Monitoring Events. For each Covered Process Unit that is subject to comparative monitoring in any given year, the historic, average leak percentage from prior periodic monitoring events, broken down by equipment type (*i.e.*, valves, pumps, agitators, connectors, and OELCDs) shall be calculated. The following number of complete monitoring periods immediately preceding the comparative monitoring shall be used for this purpose: valves - four periods; pumps and agitators – twelve periods; connectors – two periods; and OELCDs - four periods.

c.    Calculating the Comparative Monitoring Leak Ratio. For each Covered Process Unit and each Covered Type of Equipment, the ratio of the Comparative Monitoring Audit Leak Percentage from Paragraph 46.a to the historic, average leak percentage from Paragraph 46.b shall be calculated. This ratio shall be called the "Comparative Monitoring Leak Ratio." If the denominator in this calculation is "zero," it shall be assumed (for purposes of this calculation but not for any other purpose under this Consent Decree or under any applicable laws and regulations) that one leaking piece of equipment was found in the process unit through routine monitoring during the 12-month period before the comparative monitoring and the ratio shall be recalculated.

d.    For the first LDAR audit only, Defendant shall not be required to undertake comparative monitoring on OELCDs or calculate a Comparative Monitoring Leak Ratio for OELCDs because of the unavailability of historic, average leak percentages for OELCDs.

47.    When More Frequent Periodic Monitoring is Required. If a Comparative Monitoring Audit Leak Percentage calculated pursuant to Paragraph 46.a triggers a more frequent monitoring schedule under any applicable federal, state, or local law or regulation than the frequency listed in the applicable Paragraph in Subsection C -- that is, either Paragraph 13 or

14 -- for the equipment type in that Covered Process Unit, Defendant shall monitor the affected type of equipment at the greater frequency unless and until less frequent monitoring is again allowed under the specific federal, state, or local law or regulation. For the purpose of determining whether a more frequent monitoring schedule is required under this Paragraph for valves, the Comparative Monitoring Audit Leak Percentage and the percent leaking valves from the preceding monitoring period shall be averaged, and this average shall be used to determine whether the valve monitoring frequency must be shortened pursuant to 40 C.F.R. §63.168(d)(1). At no time may Defendant monitor at intervals longer than those listed in the applicable Paragraph in Subsection C.

       48.     <u>Corrective Action Plan ("CAP").</u>

       a.     <u>Requirements of a CAP.</u> By no later than 30 days after each LDAR Audit Completion Date, Defendant shall develop a preliminary Corrective Action Plan if: (i) the results of an LDAR audit identify any deficiencies; or (ii) if the Comparative Monitoring Leak Ratio calculated pursuant to Paragraph 46.c is 3.0 or higher (except that the Comparative Monitoring Leak Ratio does not trigger any requirements under this Subparagraph if the Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 46.a is less than 0.5 percent). The preliminary CAP shall describe the actions that Defendant has taken or shall take to address: (i) the deficiencies and/or (ii) the causes of a Comparative Monitoring Leak Ratio that is 3.0 or higher (but only if the Comparative Monitoring Audit Leak Percentage is at or above 0.5 percent). Defendant shall include a schedule by which actions that have not yet been completed shall be completed. Defendant promptly shall complete each corrective action item with the goal of completing each action within 90 days after the LDAR Audit Completion Date. If any action is not completed or not expected to be completed within 90 days after the LDAR

Audit Completion Date, Defendant shall explain the reasons and propose a schedule for prompt completion in the final CAP to be submitted under Subparagraph 48.b.

       b.     <u>Submission of the Final CAP to EPA.</u> By no later than 120 days after the LDAR Audit Completion Date, Defendant shall submit the final CAP to EPA, together with a certification of the completion of each item of corrective action. If any action is not completed within 90 days after the LDAR Audit Completion Date, Defendant shall explain the reasons, together with a proposed schedule for prompt completion. Defendant shall submit a supplemental certification of completion by no later than 30 days after completing all actions.

       c.     <u>EPA Review/Comment on CAP.</u> EPA may submit comments on the CAP. Except for good cause, EPA may not request Defendant to modify any action within the CAP that already has been completed or is in progress at the time of EPA's comments. Within 30 days of receipt of any comments from EPA, Defendant shall submit a reply. Disputes arising with respect to any aspect of a CAP shall be resolved in accordance with the dispute resolution provisions of this Decree.

**Subsection L:  Certification of Compliance**

49.     Within 180 days after the initial LDAR Audit Completion Date, Defendant shall certify to EPA that, to the signer's best knowledge and belief formed after reasonable inquiry: (i) except as otherwise identified, the Covered Process Units are in compliance with all applicable LDAR regulations and this LDAR Program; (ii) Defendant has completed all corrective actions, if applicable, or is in the process of completing all corrective actions pursuant to a CAP; and (iii) all equipment at the Covered Process Units that is regulated under LDAR has been identified and included in the Covered Process Units' LDAR Programs. To the extent that

Defendant cannot make the certification in all respects, Defendant shall specifically identify any deviations from Items (i) - (iii).

**Subsection M: Recordkeeping**

50.     Defendant shall keep all records required by this LDAR Program, including each LDAR audit report, to document compliance with the requirements of this LDAR Program for at least two years after termination of this Decree. Upon request by EPA, Defendant shall make all such documents available to EPA and shall provide, in electronic format if so requested, all LDAR monitoring data generated during the life of this Consent Decree.

## VI.     ADDITIONAL INJUNCTIVE RELIEF

51.     Defendant shall implement controls on Vessel 202-F located at the Phenol II unit in accordance with the control requirements for oil/water separators set forth in Table 35 of 40 C.F.R. Pt. 63, Subpt. G in accordance with the following schedule:

     a.     Within 60 days of the date of lodging this Consent Decree, Defendant shall submit any necessary application for a permit or permit modification to implement these controls. Within 180 days of approval of any such permit / permit modification application, Defendant shall construct and implement the controls on Vessel 202-F; or

     b.     Within 180 days of the Effective Date, Defendant shall construct and implement the controls on Vessel 202-F if ALTIVIA determines no permit / permit modification is necessary to implement such controls.

Such controls shall be subject to the requirements of and operated to the extent provided by 40 C.F.R. Pt. 63, Subpts. F and G.

52. Performance Testing

    a.    Within 60 days of implementation of controls on Vessel 202-F, Defendant shall submit for EPA review and approval a Performance Test Protocol containing a written protocol by which Defendant will conduct the Performance Test for the control device of Vessel 202-F in accordance with EPA Methods and 40 C.F.R. Pt. 63, Subpts. F and G. The protocol shall include the approved EPA Method(s) to be used and proposed operating conditions. Defendant shall provide written notice of the scheduled date of the Performance Test at least 30 days prior to such Performance Test.

    b.    By no later than 60 days following EPA approval of the Performance Test Protocol, Defendant shall conduct a Performance Test in accordance with the approved Performance Test Protocol to measure the HAP emission rate and demonstrate HAP reduction efficiency at the controls for Vessel 202-F.

    c.    By no later than 60 days following the Performance Test, Defendant shall submit to EPA a report that contains the results of the Performance Test for all test runs, including but not limited to: (i) production/processing rates at the time of the test; (ii) all calculations; (iii) HAP reduction efficiency; and (iv) all appendices.

53. For all Covers, beginning no later than three months after the Effective Date, Defendant shall comply with the following:

a.	Defendant shall monitor and visually inspect each tightly fitting solid cover (TFSC) and replace each TSFC with visible cracks, rust, or other defect that does not allow for a proper seal to be made;

b.	Defendant shall monitor each Cover semi-annually per Paragraph 53.e, unless: (i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the relevant Covered Process Unit has been permanently shut down.

c.	For all leaks from Covers detected at or above the leak definition of 500 ppm above background, Defendant shall perform repairs in accordance with Paragraph 53.d.

d.	By no later than five days after detecting a leak, Defendant shall perform a first attempt at repair. By no later than 15 days after detecting a leak, Defendant shall perform a final attempt at repair of the leaking Cover.

e.	For all Covers, beginning no later than three months after the date of lodging, Defendant shall comply with Method 21 in performing LDAR monitoring, using an instrument attached to a data logger (or an equivalent instrument) which directly electronically records the Screening Value detected at each piece of equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and technician. Defendant shall transfer this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

f.	In each annual report (Section VII of this Consent Decree), Defendant shall provide the following summary of the monitoring results:

(1)	Number of Covers monitored for period, by type;

(2)	Each leak, by tag number or other identification, per Paragraph 53.c; and

(3) Repair information for each leak identified in Paragraph 53.f.2.

54. For all Collaterally Impacted Infrastructure, beginning no later than three months after the date of lodging, Defendant shall comply with the following:

a. Defendant shall monitor all Collaterally Impacted Infrastructure annually per Paragraph 54.c, unless: (i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the relevant Covered Process Unit has been permanently shut down.

b. Where material within Collaterally Impacted Infrastructure is detected at or above the leak definition of 500 ppm above background, Defendant will clear such equipment of any accumulated sheen or organic material to bring the emission levels below 500 ppm within 15 days of detection.

c. For all Collaterally Impacted Infrastructure, beginning no later than three months after the date of lodging, Defendant shall comply with Method 21 in performing monitoring, using an instrument attached to a data logger (or an equivalent instrument) which directly electronically records the Screening Value detected at each piece of equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and technician. Defendant shall transfer this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

d. In each annual report (Section VII of this Consent Decree), Defendant shall provide a summary of the monitoring results including each detection

in excess of the Screening Value identification, and a description of clean up undertaken.

55.     For all Collaterally Impacted Infrastructure located in the vicinity of either a maintenance activity or known spill that could credibly result in the accumulation of any organics in these devices:

a.     Defendant shall perform a Screening Value reading per Paragraph 55.c within 24 hours of the maintenance activity or spill giving rise to the potential for accumulation of organics;

b.     In the event a Screening Value Reading of 500 ppm or greater is identified, Defendant will clear such equipment of any organic material to bring the emissions levels below 500 ppm within 15 days.

c.     Defendant shall comply with Method 21 in performing monitoring, using an instrument attached to a data logger (or an equivalent instrument) which directly electronically records the Screening Value detected at each piece of equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and technician. Defendant shall transfer this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

d.     In each annual report (Section VII of this Consent Decree), Defendant shall provide a summary of the monitoring results including each detection in excess of the Screening Value identification, and a description of clean up undertaken.

## VII. REPORTING REQUIREMENTS

56. By January 31st of each year after the lodging of this Consent Decree, until termination of this Decree pursuant to Section XIX, Defendant shall submit an annual report for the preceding six months that shall include:

a. The number of LDAR Personnel assigned to LDAR functions at each Covered Process Unit, excluding Personnel whose functions involve the non-monitoring aspects of repairing leaks, and the approximate percentage of time each such person dedicated to performing his/her LDAR functions;

b. An identification and description of any non-compliance with the requirements of Section V (Compliance Requirements);

c. An identification of any problems encountered in complying with the requirements of Section V (Compliance Requirements);

d. The information required by Paragraph 38 of Subsection V.G;

e. A description of the trainings conducted in accordance with this Consent Decree;

f. Any deviations identified in the QA/QC performed under Subsection V.J, as well as any corrective actions taken under that Subsection;

g. A summary of LDAR audit results including specifically identifying all alleged deficiencies;

h. The status of all actions under any CAP that was submitted during the reporting period, unless the CAP was submitted less than one month before the compliance status report;

i.      The status of all action taken regarding compliance with the injunctive

            relief requirements relating to Vessel 202-F (Paragraphs 51 and 52);

    j.      The status of all action taken regarding compliance with the injunctive

            relief requirements relating to Covers, as required in Paragraph 53.f;

    k.      The status of all action taken regarding compliance with the injunctive

            relief requirements relating to Collaterally Impacted Infrastructure in

            Paragraphs 54 and 55.

57.    Whenever any violation of this Consent Decree or any other event affecting

Defendant's performance under this Decree may pose an immediate threat to the public health or

welfare or the environment, Defendant shall notify EPA orally or by electronic or facsimile

transmission as soon as possible, but no later than 24 hours after Defendant first knew of the

violation or event.

58.    All reports shall be submitted to the persons designated in Section XV (Notices).

59.    Each report submitted by Defendant under this Section shall be signed by an

official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all
> attachments were prepared under my direction or supervision in
> accordance with a system designed to assure that qualified
> personnel properly gather and evaluate the information submitted.
> Based on my inquiry of the person or persons who manage the
> system, or those persons directly responsible for gathering the
> information, the information submitted is, to the best of my
> knowledge and belief, true, accurate, and complete. I have no
> personal knowledge that the information submitted is other than
> true, accurate, and complete. I am aware that there are significant
> penalties for submitting false information, including the possibility
> of fine and imprisonment for knowing violations.

60.    This certification requirement does not apply to emergency or similar

notifications where compliance would be impractical.

61.     The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the CAA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

62.     Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

VIII.   INCORPORATION OF CONSENT DECREE REQUIREMENTS INTO FEDERALLY ENFORCEABLE PERMITS

63.     <u>Permits Needed to Meet Compliance Obligations</u>.  If any compliance obligation under Section V of this Consent Decree (Injunctive Relief) requires Defendant to obtain a federal, state, or local permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals. All applications must be submitted within three years of the Effective Date, unless otherwise stated herein. Any permit required under State law must comply with all applicable State statutory and regulatory requirements for obtaining such permit.

64.     Prior to termination of this Consent Decree, Defendant shall submit to applicable permitting authorities complete applications, amendments, and/or supplements for the Facility to incorporate the limits and standards consistent with the compliance parameters specified in Paragraph 51 relating to control requirements for unit 202-F as "applicable requirements" into a non-Title V, federally enforceable permit that will survive termination of this Consent Decree.

65.     Modifications to Title V Operating Permits. Prior to termination of this Consent Decree, Defendant shall submit complete applications to applicable permitting authorities to modify, amend or revise its Title V Permit for the Facility to incorporate the applicable limits and standards identified in the preceding Paragraph into the Title V Permit. The Parties agree

that the incorporation of these emission limits and standards into the Title V Permit shall be done in accordance with applicable state or local Title V rules. The Parties agree that the incorporation may be by "amendment" under 40 C.F.R. § 70.7(d) and analogous state Title V rules, where allowed by state law.

IX.     STIPULATED PENALTIES

66.     Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

67.     Late Payment of Civil Penalty. If Defendant fails to pay the civil penalty required to be paid under Section IV (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $2,500 per Day for each Day that the payment is late.

68.     Failure to Meet Injunctive Relief Consent Decree Obligations. Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 2 below unless excused under Section X (Force Majeure).

**Table 2**

| Violation | Stipulated Penalty | |
|---|---|---|
| a. Failure to timely develop a Facility-Wide LDAR Document as required by Paragraph 12 or failure to timely update the Document on an annual basis if needed pursuant to Paragraph 12 | Period of noncompliance | Penalty per day late |
| | 1 - 15 days | $300 |
| | 16 - 30 days | $400 |
| | 31 days or more | $500 |

| Violation | Stipulated Penalty |
|---|---|
| b. Each failure to perform monitoring at the frequencies set forth in Paragraph 13 or, if applicable, Paragraph 14 | $100 per component per missed monitoring event, not to exceed $25,000 per month per Covered Process Unit |
| c. Each failure to comply with Method 21 in performing LDAR monitoring, in violation of Paragraph 15 | Monitoring frequency for the component      Penalty per monitoring event per process unit<br><br>Every 2 years      $25,000<br>Annual      $20,000<br>Semi-Annual      $15,000<br>Quarterly      $10,000<br>Monthly      $5,000 |
| d. For each failure to use a monitoring device that is attached to a datalogger and for each failure, during each monitoring event, to directly electronically record the Screening Value, date, time, identification number of the monitoring instrument, and the identification of technician, in violation of these requirements of Paragraph 15 | $100 per failure per piece of equipment monitored |
| e. Each failure to transfer monitoring data to an electronic database on at least a weekly basis, in violation of this requirement in Paragraph 15 | $150 per day for each day that the transfer is late |
| f. Each failure to timely perform a first attempt at repair as required by Paragraph 18 or 20, unless not required to do so under Subparagraph 30.d.i or 36.c.i. For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 19 after the repair attempt; the stipulated penalties in Subparagraph 68.h do not apply. | $150 per day for each late day, not to exceed $1,500 per leak |

| Violation | Stipulated Penalty | | |
|---|---|---|---|
| g. Each failure to timely perform a final attempt at repair as required by Paragraph 18, unless not required to do so under Subparagraph 30.d.i or 36.c.i. For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 19 after the repair attempt; the stipulated penalties in Subparagraph 68.h do not apply. | Equipment type | Penalty per Component per day late | Not to Exceed |
| | Valves, connectors | $300 | $37,500 |
| | Pumps, agitators | $1,200 | $150,000 |
| h. Each failure to timely perform Repair Verification Monitoring as required by Paragraph 19 in circumstances where the first attempt to adjust, or otherwise alter, the piece of equipment to eliminate the leak was made within five days and the final attempt to adjust, or otherwise alter, the piece of equipment to eliminate the leak was made within 15 days | Equipment Type | Penalty per Component per day late | Not to Exceed |
| | Valves, connectors | $150 | $18,750 |
| | Pumps, agitators | $600 | $75,000 |
| i. Each failure to undertake the drill-and-tap method as required by Paragraph 22 | Period of noncompliance | Penalty per component per day late | |
| | Between 1 and 15 days | $200 | |
| | Between 16 and 30 days | $350 | |
| | Over 30 days | $500 per day for each day over 30, not to exceed $37,500 | |
| j. Each failure to record the information required by Paragraph 23 | $100 per component per item of missed information | | |
| k. Each improper placement of a piece of Covered Equipment on the DOR list (*e.g.*, placing a piece of Covered Equipment on the DOR list even though it is feasible to repair it without a process unit shutdown) | Equipment Type | Penalty per component per day on list | Not to exceed |
| | Valve, connectors | $300 | $75,000 |
| | Pumps, Agitators | $1,200 | $300,000 |

| Violation | Stipulated Penalty |
|---|---|
| l. Each failure to comply with the requirement in Subparagraph 25.a that a relevant unit supervisor or person of similar authority sign off on placing a piece of Covered Equipment on the DOR list | $250 per piece of Covered Equipment |
| m. Each failure to comply with the requirements of Subparagraph 25.c.(i) | Refer to the applicable stipulated penalties in Subparagraphs 68.f and 68.g |
| n. Each failure to comply with the requirements of Subparagraph 25.c.(ii) | Refer to the applicable stipulated penalties in Subparagraphs 68.p – u. |
| o. Each failure to comply with the work practice standards in Paragraph 27 | $50 per violation per valve per day, not to exceed $30,000 for all valves in a Covered Process Unit per quarter |
| p. Each failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so pursuant to Paragraph 28 | $20,000 per failure, except as provided in Paragraph 68A below |
| q. Each failure, in violation of Subparagraph 30.b, to timely comply with the requirements relating to installing a Low-E Valve or Low-E Packing if a process unit shutdown is not required | $500 per day per failure, not to exceed $20,000, except as provided in Paragraph 68A below |
| r. Each failure, in violation of Subparagraph 30.c, to install a Low-E Valve or Low-E Packing when required to do so during a Maintenance Shutdown | $20,000 per failure, except as provided in Paragraph 68A below |
| s. Each failure, in violation of Paragraph 35, to timely comply with the requirements relating to replacing or improving a connector for any new connector installation | $10,000 per failure |
| t. Each failure, in violation of Subparagraph 36.b., to timely comply with the requirements relating to replacing or improving a connector if the replacement or improvement does not require a process unit shutdown | $250 per day per failure, not to exceed $10,000 per failure |

| Violation | Stipulated Penalty |
|---|---|
| u. Each failure, in violation of Subparagraph 36.b, to comply with the requirements relating to replacing or improving a connector if the replacement or improvement requires a process unit shutdown | $10,000 per failure |
| v. Each failure to add a piece of Covered Equipment to the LDAR Program when required to do so pursuant to the evaluation required by Paragraph 39 (MOC) | $300 per piece of Covered Equipment (plus an amount, if any, due under Paragraph 68.b for any missed monitoring event related to a component that should have been added to the LDAR Program but was not) |
| w. Each failure to remove a piece of Covered Equipment from the LDAR Program when required to do so pursuant to Paragraph 39 | $150 per failure per piece of Covered Equipment |
| x. Each failure to timely develop a training protocol as required by Paragraph 40 | $50 per day late |
| y. Each failure to perform initial, refresher, or new personnel training as required by Paragraph 40 | $1,000 per person per month late |
| z. Each failure of a monitoring technician to complete the certification required in Paragraph 41 | $100 per failure per technician |
| aa. Each failure to perform any of the requirements relating to QA/QC in Paragraph 42 | $1,000 per missed requirement per quarter |
| bb. Each failure to conduct an LDAR audit in accordance with the schedule set forth in Paragraph 44. | Period of noncompliance  Penalty per day<br><br>1-15 days          $300<br>16-30 days       $400<br>31 days or more   $500, not to exceed $100,000 per audit |

| Violation | Stipulated Penalty |
|---|---|
| cc. Each failure to use a third party as an auditor; each use of a third party auditor that is not experienced in LDAR audits; and each use of Defendant's regular LDAR contractor to conduct the third party audit, in violation of the requirements of Paragraph 43. | $25,000 per audit |
| dd. Except for the requirement to undertake Comparative Monitoring, each failure to substantially comply with the LDAR audit requirements in Paragraph 45 | $100,000 per audit |
| ee. Each failure to substantially comply with the Comparative Monitoring requirements of Paragraph 46 | $50,000 per audit |
| ff. Each failure to timely submit a Corrective Action Plan that substantially conforms to the requirements of Paragraph 48 | Period of noncompliance — Penalty per day per violation<br><br>1-15 days — $100<br>16-30 days — $250<br>31 days or more — $500<br><br>Not to exceed $100,000 per audit |
| gg. Each failure to implement a corrective action within 90 days after the LDAR Audit Completion Date or pursuant to the schedule that Defendant must propose pursuant to Subparagraph 48.b if the corrective action cannot be completed in 90 days | Period of noncompliance — Penalty per day per violation<br><br>1-15 days — $500<br>16-30 days — $750<br>31 days or more — $1,000<br><br>Not to exceed $200,000 per audit |

| Violation | Stipulated Penalty |
|---|---|
| hh. Each failure to timely submit a Certification of Compliance that substantially conforms to the requirements of Paragraph 49 | Period of noncompliance    Penalty per day per violation<br><br>1-15 days      $100<br>16-30 days      $250<br>31 days or more      $500<br><br>Not to exceed $75,000 |
| ii. Each failure to substantially comply with any recordkeeping, submission, or reporting requirement in Sections V and VII not specifically identified above in this Table 2. | Period of noncompliance    Penalty per day per violation<br>1-15 days      $100<br>16-30 days      $250<br>31 days or more      $500 |
| jj. Each failure to substantially comply with obligations relating to Covers as set forth in Paragraph 53. | Period of noncompliance    Penalty per day per violation<br>1-15 days      $250<br>16-30 days      $500<br>31 days or more      $1,000 |
| kk. Each failure to substantially comply with obligations relating to Collaterally Impacted Infrastructure requirements as set forth in Paragraphs 54 and 55. | Period of noncompliance    Penalty per day per violation<br>1-15 days      $250<br>16-30 days      $500<br>31 days or more      $1,000 |

68A.   <u>Stipulated Penalties in Lieu of those in Subparagraphs 68.p, q., and r</u>.

a.      For purposes of this Paragraph, the term "Non-Compliant Valve" means a valve that is either: (i) not a Low-E Valve; or (ii) not fitted with Low-E Packing.  The term "Compliant Valve" means a valve that is either: (i) a Low-E Valve; or (ii) fitted with Low-E Packing.

b.     The stipulated penalties in Subparagraph 68A.c are to be used instead of those in Subparagraphs 68.p, 68.q, or 68.r when a Non-Compliant Valve is installed instead of a Compliant Valve and all of the following requirements are met:

i.     Defendant, and not a government agency, discovers the failure involved;

ii.     Defendant promptly reports the failure to EPA;

iii.     In the report, Defendant sets forth a schedule for promptly replacing the Non-Compliant Valve with a Compliant Valve; provided, however, that Defendant shall not be required to undertake an unscheduled shutdown of the affected Covered Process Unit in proposing the schedule unless Defendant so chooses;

iv.     Defendant monitors the Non-Compliant Valve once a month from the time of its discovery until the valve is replaced with a Compliant Valve and no Screening Values above 100 ppm are recorded;

v.     Defendant replaces the Non-Compliant Valve with a Compliant Valve in accordance with the schedule set forth in 68A.b.iii; and

vi.     Defendant demonstrates that in good faith they intended to install a Compliant Valve but inadvertently installed a Non-Compliant Valve.

c.    The following stipulated penalties shall apply under the circumstances in Paragraph 68A:

        i.    In lieu of the penalty in Subparagraph 68.p, $2,000 per failure.

        ii.    In lieu of the penalty in Subparagraph 68.q, $50 per day per failure, not to exceed $2,000.

        iii.    In lieu of the penalty in Subparagraph 68.r, $2,000 per failure.

69.    <u>Additional Injunctive Relief</u>. If Defendant fails to satisfactorily complete the Additional Injunctive Relief by the deadline set forth in Paragraph 51, Defendant shall pay stipulated penalties for each day for which it fails to satisfactorily complete the Additional Injunctive Relief, as follows:

| Penalty Per Day | Period of Noncompliance |
|---|---|
| $750 | 1st through 14th day |
| $1,000 | 15th through 30th day |
| $1,250 | 31st day and beyond |

70.    If Defendant fails to satisfactorily complete the Additional Injunctive Relief by the deadline set forth in Paragraph 52, Defendant shall pay stipulated penalties for each day for which it fails to satisfactorily complete the Additional Injunctive Relief, as follows:

| Penalty Per Day | Period of Noncompliance |
|---|---|
| $100 | 1st through 14th day |
| $500 | 15th through 30th day |
| $1,000 | 31st day and beyond |

71.    Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue

to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

72.     Defendant shall pay any stipulated penalty within 30 Days of receiving the United States' written demand.

73.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

74.     Stipulated penalties shall continue to accrue as provided in Paragraph 70, during any Dispute Resolution, but need not be paid until the following:

        a.     If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, Defendant shall pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of EPA's decision or order.

        b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

        c.     If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

75.     Defendant shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

76.     If Defendant fails to pay stipulated penalties according to the terms of this
Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in
28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall
be construed to limit the United States from seeking any remedy otherwise provided by law for
Defendant's failure to pay any stipulated penalties.

77.     The payment of penalties and interest, if any, shall not alter in any way
Defendant's obligation to complete the performance of the requirements of this Consent Decree.

78.     <u>Non-Exclusivity of Remedy.</u> Stipulated penalties are not the United States'
exclusive remedy for violations of this Consent Decree. Subject to the provisions of Section XIII
(Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to
seek any other relief it deems appropriate for Defendant's violation of this Decree or applicable
law, including but not limited to an action against Defendant for statutory penalties, additional
injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any
statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount
equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## X.     FORCE MAJEURE

79.     "Force majeure," for purposes of this Consent Decree, is defined as any event
arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of
Defendant's contractors, that delays or prevents the performance of any obligation under this
Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that
Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate
any potential force majeure event and best efforts to address the effects of any potential force
majeure event (a) as it is occurring and (b) following the potential force majeure, such that the

delay and any adverse effects of the delay are minimized. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

80.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice orally or by electronic or facsimile transmission to EPA, within 72 hours of when Defendant first knew that the event might cause a delay. Within seven days thereafter, Defendant shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendant shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure. Failure to comply with the above requirements shall preclude Defendant from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any entity controlled by Defendant, or Defendant's contractors knew or should have known.

81.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA

will notify Defendant in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

82.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant in writing of its decision.

83.     If Defendant elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Defendant shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant complied with the requirements of Paragraphs 79 and 80. If Defendant carries this burden, the delay at issue shall be deemed not to be a violation by Defendant of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.     DISPUTE RESOLUTION

84.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

85.     <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal

negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 45 Days after the conclusion of the informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below.

86.     Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

87.     The United States shall serve its Statement of Position within 45 Days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

88.     Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XV (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within ten Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief

requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

89. The United States shall respond to Defendant's motion within the time period allowed by the Local Rules of this Court. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

90. Standard of Review

a. Disputes Concerning Matters Accorded Record Review. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 86 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendant shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b. Other Disputes. Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 86, Defendant shall bear the burden of demonstrating that its position complies with this Consent Decree and better further the objectives of the Consent Decree.

91. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 74. If

Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII.   INFORMATION COLLECTION AND RETENTION

92.     The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

     a.     monitor the progress of activities required under this Consent Decree;

     b.     verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

     c.     obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants;

     d.     obtain documentary evidence, including photographs and similar data; and

     e.     assess Defendant's compliance with this Consent Decree.

93.     Upon request, Defendant shall provide EPA or its authorized representatives splits of any samples taken by Defendant. Upon request, EPA shall provide Defendant splits of any samples taken by EPA.

94.     Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or

procedures. At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

95.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to EPA. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege.

96.     Defendant may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendant seeks to protect as CBI, Defendant shall follow the procedures set forth in 40 C.F.R. Part 2.

97.     This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain

documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

98.     This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the date of lodging.

99.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 98. The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Defendant's Facility, whether related to the violations addressed in this Consent Decree or otherwise.

100.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to the Facility, Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 98.

101.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations,

and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA, 42 U.S.C. § 7413, et seq., or with any other provisions of federal, state, or local laws, regulations, or permits.

102.     This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

103.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XIV.   COSTS

104.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendant.

## XV.   NOTICES

105.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

As to the United States by email:     eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-5-2-1-11905

As to the United States by mail:    EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Re: DJ # 90-5-2-1-11905


As to EPA by email:    R5ardreporting@epa.gov

Re: DJ # 90-5-2-1-11905


For courtesy purposes only, electronic copies to:
loukeris.constantinos@epa.gov
nelson.victoria@epa.gov
mikalian.charles@epa.gov


As to Defendant by email:    talbert@altivia.com
contracts@altivia.com
ceo@altivia.com


As to Defendant by mail:    ALTIVIA Petrochemicals, LLC
1100 Louisiana, Suite 4800
Houston, TX  77002
Attn.:  Chief Executive Officer

ALTIVIA Petrochemicals, LLC
Haverhill Complex
1909 Haverhill-Ohio Furnace Road
Haverhill, OH  45636
Attn.:  Plant Manager

106.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

107.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.   EFFECTIVE DATE

108.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVII.   RETENTION OF JURISDICTION

109.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XI and XVIII, or effectuating or enforcing compliance with the terms of this Decree.

## XVIII. MODIFICATION

110.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

111.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XI (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 90, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX.   TERMINATION

112.    No sooner than after completion of the third LDAR audit required pursuant to Subsection V.K of this Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied the requirements of Section V (Compliance

Requirements) and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, together with all necessary supporting documentation.

113.     Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

114.     If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section XI. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination until 60 Days after service of its Request for Termination.

## XX.     PUBLIC PARTICIPATION

115.     This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XXI. SIGNATORIES/SERVICE

116.     Each undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

117.     This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Defendant agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXII. INTEGRATION

118.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXIII. 26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

119.     For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2),

performance of Paragraphs 5, 11-56, 58, 59, 92-95, and Appendix A is restitution, remediation, or required to come into compliance with law.

## XXIV. FINAL JUDGMENT

120.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXV.  APPENDICES

121.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" are the Commercial Unavailability factors

Dated and entered this __ day of _____, 2022

_____
UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:


TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


_____                    _____
Date                              JEFFREY A. SPECTOR
                                  Senior Attorney
                                  Environmental Enforcement Section
                                  Environment and Natural Resources Division
                                  U.S. Department of Justice
                                  Washington, DC  20044-7611


                                  KENNETH L. PARKER
                                  United States Attorney
                                  Southern District of Ohio


                                  ___/s Matthew Horwitz_____
                                  MATTHEW HORWITZ
                                  Assistant United States Attorney
                                  Office of the United States Attorney
                                  Southern District of Ohio

FOR THE U.S. ENVIRONMENTAL PROTECTION
AGENCY:

ROBERT KAPLAN    Digitally signed by ROBERT
                 KAPLAN
                 Date: 2022.09.15 17:10:40 -05'00'

ROBERT A. KAPLAN
Regional Counsel
U.S. Environmental Protection Agency, Region 5

Signature page in *United States v. ALTIVIA Petrochemicals, LLC*, Civil No. 1:21-cv-00640 (S.D. Ohio)

FOR ALTIVIA Petrochemicals, LLC:

July 14, 2022
Date

TIMOTHY ALBERT
Vice-President, Manufacturing

67

# APPENDIX A

## Factors to be Considered and Procedures to be Followed
## to Claim Commercial Unavailability

This Appendix outlines the factors to be taken into consideration and the procedures to be followed for Defendant to assert that a Low-E Valve or Low-E Packing is "commercially unavailable" pursuant to Paragraph 32 of the Consent Decree.

## I.    FACTORS

A.    Nothing in this Consent Decree or this Appendix requires Defendant to utilize any valve or packing that is not suitable for its intended use in a Covered Process Unit.

B.    The following factors are relevant in determining whether a Low-E Valve or Low-E Packing is commercially available to replace or repack an existing valve:

1.    Valve type (*e.g.,* ball, gate, butterfly, needle) (this LDAR Program does not require consideration of a different type of valve than the type that is being replaced)

2.    Nominal valve size (*e.g.,* 2 inches, 4 inches)

3.    Compatibility of materials of construction with process chemistry and product quality requirements

4.    Valve operating conditions (*e.g.,* temperature, pressure)

5.    Service life

6.    Packing friction (*e.g.,* impact on operability of valve)

7.    Whether the valve is part of a packaged system or not

8.    Retrofit requirements (*e.g.,* re-piping or space limitations)

9.    Other relevant considerations

C.    The following factors may also be relevant, depending upon the process unit or equipment where the valve is located:

10.    In cases where the valve is a component of equipment that Defendant is licensing or leasing from a third party, valve or valve packing specifications identified by the lessor or licensor of the equipment of which the valve is a component

11.    Valve or valve packing vendor or manufacturer recommendations for the relevant process unit components.

## II. PROCEDURES THAT DEFENDANT SHALL FOLLOW TO ASSERT COMMERCIAL UNAVAILABILITY

A.  Defendant shall comply with the following procedures if it seeks to assert commercial unavailability under Paragraph 32 of the Consent Decree:

1.  Defendant must contact a reasonable number of vendors of valves or valve packing that Defendant, in good faith, believes may have valves or valve packing suitable for the intended use taking into account the relevant factors listed in Section I above.

   a.  For purposes of this Consent Decree, a reasonable number of vendors presumptively means no less than three.

   b.  If fewer than three vendors are contacted, the determination of whether such fewer number is reasonable shall be based on Factors 10 and 11 or on a demonstration that fewer than three vendors offer valves or valve packing considering Factors 1–9.

2.  Defendant shall obtain a written representation from each vendor, or equivalent documentation, that a particular valve or valve packing is not available as "Low-Emissions" from that vendor for the intended conditions or use.

   a.  "Equivalent documentation" may include e-mail or other correspondence or data showing that a valve or valve packing suitable for the intended use does not meet the definition of "Low-E Valve" or "Low-E Packing" in the Consent Decree or that the valve or packing is not suitable for the intended use.

   b.  If the vendor does not respond or refuses to provide documentation, "equivalent documentation" may consist of records of Defendant's attempts to obtain a response from the vendor.

3.  Each Compliance Status Report required by Section VII of the Consent Decree shall identify each valve that Defendant otherwise was required to replace or repack, but for which, during the time period covered by the Report, Defendant determined that a Low-E Valve and/or Low-E Packing was not commercially-available. Defendant shall provide a complete explanation of the basis for its claim of commercial unavailability, including, as an attachment to the Compliance Status Report, all relevant documentation. This report shall be valid for a period of twelve months from the date of the report for the specific valve involved and all other similar valves, taking into account the factors listed in Part I.

## III. OPTIONAL EPA REVIEW OF DEFENDANT'S ASSERTION OF COMMERCIAL UNAVAILABILITY

       A.    At its option, EPA may review an assertion by Defendant of commercial unavailability. If EPA disagrees with Defendant's assertion, EPA shall notify Defendant in writing, specifying the Low-E Valve or Low-E Packing that EPA believes to be commercially available and the basis for its view that such valve or packing is appropriate taking into consideration the Factors described in Part I. After Defendant receives EPA's notice, the following shall apply:

       1.    Defendant shall not be required to retrofit the valve or valve packing for which it asserted commercial unavailability (unless Defendant is otherwise required to do so pursuant to another provision of the Consent Decree).

       2.    Defendant shall be on notice that EPA will not accept a future assertion of commercial unavailability for: (i) the valve or packing that was the subject of the unavailability assertion; and/or (ii) a valve or packing that is similar to the subject assertion, taking into account the Factors described in Part I.

       3.    If Defendant disagrees with EPA's notification, Defendant and EPA shall informally discuss the basis for the claim of commercial unavailability. EPA may thereafter revise its determination, if necessary.

       4.    If Defendant makes a subsequent commercial unavailability claim for the same or similar valve or packing that EPA previously rejected, and the subsequent claim also is rejected by EPA, Defendant shall retrofit the valve or packing with the commercially available valve or packing unless Defendant is successful under Subsection III.B below.

       B.    Any disputes under this Appendix first shall be subject to informal discussions between Defendant and EPA for a period not to exceed 30 days before Defendant shall be required to invoke the Dispute Resolution provisions of Section XI of the Consent Decree. Thereafter, if the dispute remains, Defendant shall invoke the Dispute Resolution provisions.